Michael LETSON, an individual,
Plaintiff,

v.

DEAN WITTER REYNOLDS,
INC., Defendant.

SHEARSON LOEB RHOADES, INC., a
corporation, Plaintiff,

v.

Kerry BRYANT, an individual,
Defendant.

Kerry BRYANT, an individual,
Counter-Claimant,

v.

SHEARSON LOEB RHOADES, INC., a
corporation, Counter-Defendant.

No. C–81–1227–WWS, C–81–1219–WWS.

United States District Court,
N. D. California.

Jan. 25, 1982.

James A. Hennefer, San Francisco, Cal., Keesal, Young .& Logan, Long Beach, Cal., for plaintiffs.

Crosby, Heafey, Roach & May, Oakland, Cal., Rosenfeld, Meyer & Susman, Beverly Hills, Cal., for defendants.

## MEMORANDUM OF OPINION AND ORDER

WILLIAM W SCHWARZER, District Judge.

### INTRODUCTION

These actions are before the Court on motions for partial summary judgment by defendant Dean Witter Reynolds, Inc. ("Dean Witter") and counter-defendant Shearson Loeb Rhoades, Inc. ("Shearson"). Although the actions are otherwise unrelated, these motions raise similar issues and have therefore been consolidated for disposition.

The actions arise out of the liquidation by Dean Witter and Shearson of their customers' commodities futures trading accounts when market declines rendered the accounts' margins inadequate. The customers, Michael Letson and Kerry Bryant, respectively, contend that the brokerage firms wrongfully liquidated their margin accounts and seek to recover the resulting damages. The common issue raised by these motions is the measure of damages for wrongful liquidation of a margined commodities futures trading account. The material facts are not disputed.

### A. The Measure of Damages

■ Letson and Bryant claim, in substance, that the liquidation of their accounts was wrongful because they were not afforded a reasonable opportunity to meet the margin maintenance calls in their accounts prior to liquidation.[1] Assuming for purposes of these motions only that the

---

1. When purchasing a commodities contract on margin, a customer must meet a "margin call," i.e., a deposit in his account of a percentage of the purchase price, the balance being loaned to him by the broker. If the market then declines, thereby eroding the customer's equity in the contract, the broker makes a "margin mainte-

nance call," requiring the customer to post funds sufficient to restore the original margin and the security for the broker's loan. Meeting a maintenance call requires essentially the same investment as repurchasing the identical contract on the market at the then price.

liquidations in question were wrongful,[2] the measure of damages under settled principles of law is the additional amount required to repurchase the same contracts in the market within a reasonable time after liquidation. *Chipser v. Kohlmeyer & Co.*, 600 F.2d 1061, 1067–68 (5th Cir. 1979); *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90, 104–06 (10th Cir.), *cert. denied*, 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1974), *cert. denied sub nom. Reynolds v. Texas Gulf Sulphur Co.*, 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972). That amount is measured by the difference between the contracts' liquidation prices and the highest intermediate prices reached by the identical contracts during a reasonable period after the wrongful sale. *Gallagher v. Jones*, 129 U.S. 193, 200, 9 S.Ct. 335, 337, 32 L.Ed. 658 (1889); *Chipser v. Kohlmeyer & Co., supra*, 600 F.2d at 1067; *Burhorn v. Lockwood*, 71 A.D. 301, 75 N.Y.S. 828, 830 (1902), *appeal dismissed*, 177 N.Y. 539, 69 N.E. 1121 (1903).

■ This measure of damages serves two purposes. First, it compensates the trader for lost profits by giving him the highest price reached within a reasonable period following liquidation, that price being one at which the trader might have sold his positions profitably had he not been liquidated involuntarily. Second, it reflects the trader's duty to mitigate damages, taking into account that the trader has no assurance that he would have been able to repurchase during the reasonable period for less than the highest intermediate price. *See Arrington v. Merrill Lynch, Pierce, Fenner & Smith*, 651 F.2d 615, 620 (9th Cir. 1981); *Havlik v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, [1977–1980 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,544, at 22,243 (CFTC 1978); *Tavani v. Stotler & Company*, [1977–1980 Transfer Binder] Comm.Fut.

L.Rep. (CCH) ¶ 20,453, at 21,853 (CFTC 1977); *Baker v. Edward D. Jones & Co.*, [1975–1977 Transfer Binder] Comm.Fut.L. Rep. (CCH) ¶ 20,241, at 21,286 (CFTC 1976), *rev'd on other grounds*, 2 Comm.Fut.L.Rep. (CCH) ¶ 21,167 (CFTC 1981), *appeal dismissed sub nom. Baker v. Commodities Futures Trading Commission*, 661 F.2d 871 (10th Cir. 1981). As explained by the court in *Burhorn v. Lockwood, supra,*

> The customer is given a reasonable time to replace the stock, or, rather, to determine whether he wishes to or is able to replace it, for replacing it is not a condition precedent to his right to recover damages.

75 N.Y.S. at 830.

■ Under either analysis, the "reasonable period" represents the time during which the trader is involuntarily out of the market and in the process of effecting reentry.

■ As pointed out in *Burhorn*, damage recovery in a wrongful liquidation case does not depend on the trader's repurchasing his positions. The effect of the duty to mitigate is simply to limit the time period during which the trader may reenter the market at the broker's expense. Failure to reenter within the reasonable time period is deemed to be a decision to stay out; recovery is nevertheless allowed, for the reasons previously stated, based on the difference between the liquidation price and the highest price reached in the market during the period allowed for reentry.

■ What is a reasonable time in these cases is a question of law for the court where, as here, the material facts are not in dispute. *Burhorn v. Lockwood, supra*, 75 N.Y.S. at 830.[3] Courts have arrived at

---

**2.** The Court assumes liability *arguendo* for purposes of discussing the damage issue and, consistent with that assumption, the relevant facts are stated most favorably to the traders. The Court makes no findings on liability at this time. Dean Witter's and Shearson's motions for summary judgment on liability raise triable issues of fact and therefore must be denied. Nor does this ruling affect Shearson's right to

recover on its complaint to collect the debit balance in Bryant's account.

**3.** Determinations of reasonableness based on undisputed facts are properly made on summary judgment in securities cases as well as in cases arising under other laws. *See, e.g., Carpenter v. Harris, Upham and Co., Inc.*, 594 F.2d 388, 394–95 (4th Cir.), *cert. denied sub nom. Carpenter v. Edwards & Warren*, 444 U.S. 868,

widely differing answers to this question. How much time is needed to reenter the market varies, depending on such factors as the trader's experience, capabilities and resources, the conduct of the broker, and the nature of the market involved. *Fulton v. First Dover Commodities, Ltd.,* [1977–1980 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,591, at 22,459 (CFTC 1978); *Havlik v. Merrill Lynch, Pierce, Fenner & Smith, supra,* ¶ 20,544, at 22,243; *Tavani v. Stotler & Co., supra,* ¶ 20,453, at 21,853; *Hayward v. Edwards,* 167 Misc. 694, 4 N.Y.S.2d 699 (1938); *Baker v. Edward D. Jones & Co., supra,* ¶ 20,241, at 21,286.

 The general rule governing determination of reasonable time in securities cases is that a trader

> is entitled to a reasonable opportunity to consult counsel, to employ other brokers, and to watch the market for the purpose of determining whether it is advisable to purchase on a particular day, or when the stock reaches a particular quotation, and to raise funds if he decide[s] to repurchase ... [i.e.] a reasonable time to convert [property or securities] into money or to raise money on their security.

*Burhorn v. Lockwood, supra,* 75 N.Y.S. at 831. *See also Nye v. Blyth Eastman Dillon & Co., Inc.,* 588 F.2d 1189, 1198 (8th Cir. 1978).

 The rule as stated contemplates that upon notice of the wrongful conduct, the trader will have to make a second investment decision. *Nye v. Blyth Eastman Dillon & Co., Inc., supra,* 588 F.2d at 1198. Bryant and Letson contend, therefore, that they should be allowed sufficient time within which to watch and study the market to decide whether or not to re-enter. As the *Nye* case reflects, however, claims resting on misrepresentations require different treatment than claims arising out of wrongful liquidation or other unauthorized trading. *Id.* at 1200. In the former instance, the trader should be afforded sufficient time after having learned of the misrepresentation to arrive at an informed investment decision free from the influence of the prior misrepresentation. In the latter instance, however, the decision to hold (or sell) has already been made by the trader. It is a necessary premise of a wrongful liquidation claim that, but for the liquidation, the trader would have held on to his positions. No new investment decision is therefore required and the trader should be allowed no more time than is necessary to correct the broker's actions which were contrary to the trader's decision. A reasonable time in a wrongful liquidation case will therefore be substantially shorter than in a misrepresentation case.

 The statements of the general rule in cases such as *Burhorn* and *Nye* must not be read to justify a period of time which "would permit [the trader] to speculate on the future course of the market at [the broker's] expense." *Gelb v. Zimet Brothers, Inc.,* 34 Misc.2d 401, 228 N.Y.S.2d

---

100 S.Ct. 143, 62 L.Ed.2d 93 (1979) (affirming summary judgment in favor of securities brokerage firm on issue of reasonableness of their supervision as "controlling persons"); *Securities and Exchange Commission v. Research Automation Corporation,* 585 F.2d 31, 35–36 (2nd Cir. 1978) (affirming summary judgment under securities laws on issue of materiality of omissions); *Evans v. S.S. Kresge Co.,* 544 F.2d 1184, 1193–96 (3rd Cir. 1976), *cert. denied,* 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977) (affirming summary judgment on issue of reasonableness of price and product restrictions in licensing agreements under the Sherman Act); *Budget Rent-a-Car Corporation of America v. Fein,* 342 F.2d 509, 514–518 (5th Cir. 1965) (affirming summary judgment finding unreasonable a restrictive covenant in a franchise agreement).

The Ninth Circuit has specifically approved summary judgment determinations of negligence, good faith and willfulness issues which, like reasonableness, are fact-sensitive issues, when the relevant underlying facts were not in dispute. *See Flying Diamond Corporation v. Pennaluna & Co., Inc.,* 586 F.2d 707, 713 (9th Cir. 1978) (affirming summary judgment on issue of defendant's negligence in securities fraud case); *Zweig v. Hearst,* 521 F.2d 1129, 1134 (9th Cir.), *cert. denied,* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975) (affirming summary judgment for defendant publisher on issue of its good faith in securities fraud case); *Gard v. United States,* 594 F.2d 1230, 1234 n.2 (9th Cir.), *cert. denied,* 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979) (affirming summary judgment for defendant in tort action on issue of government's willfulness).

111, 114 (1962), *affirmed*, 18 A.D.2d 967, 237 N.Y.S.2d 989 (1963). The instant cases involve trading, not in investment securities, but in commodities futures contracts which have a limited life and turn over rapidly. The parties agree that the commodities market is volatile and unstable. Trading in it has been described as a "fairly risky enterprise" in which "the reinvestment period should be relatively short." *Baker v. Edward D. Jones & Co., supra*, ¶ 20,241, at 21,286; *see also*: Note, *The Measure of Damages in Rule 10b–5 Cases Involving Actively Traded Securities*, 26 Stan.L.Rev. 371, 379–80 (1974). Moreover, trading is on margin, meaning that the trader puts up only a relatively small percentage of the purchase price, the balance being borrowed from the broker. The trader as a result occupies a highly leveraged position in which a small price movement will have a disproportionately large effect on his equity.[4] Having responded to a margin call when he initially purchased the contract, the trader knows that he can expect margin maintenance calls in a falling market and that time will be of the essence in meeting them. To permit a long reinvestment period would amount to "[a]llowing the customer to merely stand aside and watch the market [and] would give the customer a profit without his incurring the involved risk." *Havlik v. Merrill Lynch, supra*, ¶ 20,544, at 22,243.

Although what is a reasonable time must turn on the facts of each case, the determinations in analogous cases before the Commodities Futures Trading Commission, an agency with expertise in this area by reason of its jurisdiction over reparations claims, provide guidelines. The Court is aware of five reported cases which address the issue of what is a reasonable time to reenter the market after wrongful liquidation of a commodities account.

In *Moore v. Cayman Associates, Ltd.*, 2 Comm.Fut.L.Rep. (CCH) ¶ 21,259 (CFTC September 24, 1981), the complainant received notice of liquidation on May 1. He was unable to contact his broker that day but spoke with the brokerage firm on May 2 to advise them he considered himself still in the market. May 3 was found to be the earliest day on which complainant could have reestablished his position. Damages were awarded on the basis of the May 3 price. In *Tavani v. Stotler & Company, supra*, the claimant went to the broker's office to complain on the day following notice of liquidation for failure to meet a maintenance call. The broker advised that if complainant would tender the required margin, he could establish a new position at a more favorable price than had prevailed on the preceding day. Complainant demanded, however, that his account be reinstated to the position held before liquidation as a precondition to meeting a margin call. Relief was denied, *inter alia*, for failure to mitigate damages. In *Havlik v. Merrill Lynch, supra*, the Commission held that a reasonable time to repurchase was "the end of the week in which complainant received notice of the liquidation ... This would have given complainant five trading days ... to reestablish his position." Had he done so, he would have been no worse off than if there had been no liquidation and his damage claim was therefore denied. In *Clampitt v. E. F. Hutton & Co.*, 2 Comm. Fut.L.Rep. (CCH) ¶ 21,120 (CFTC 1980), complainant, an inexperienced trader, received notice of liquidation on September 19. On September 26, she purchased different contracts which the Commission found to be a switch in trading strategy and not an effort to mitigate. Damages were fixed

---

**4.** When Letson opened his commodities account with Dean Witter, he executed a letter which contained the following statement:

> As a new commodity client of Dean Witter, we feel there are certain facts of which you should be aware concerning speculating in commodity futures. The commodity futures market is a particularly attractive vehicle for those individuals with the necessary risk cap-

ital and the speculative temperament to be willing to take losses as well as profits. Margin requirements are relatively low, usually 5 to 20 percent of the total value of the contract. This gives tremendous leverage to the funds employed. Because of frequent wide and rapid price fluctuations, it is possible to incur substantial losses as well as make substantial profits.

with reference to the September 26 price. In *Baker v. Edward D. Jones & Co., supra,* where the liquidation occurred on December 20, a reasonable time taking into account the intervening holiday was found to run to January 9 (at most seven trading days). On appeal to the Commission, recovery was, however, denied on the merits.

These decisions show that the Commission has found periods as short as one or two days to be a reasonable time, and has never allowed more than a calendar week (five trading days), except where a holiday intervened, within which the trader could decide whether to reenter the market.

For the trader who has not reentered the market, the longer the reinvestment period allowed, the greater the speculative opportunity to recover a larger amount of damages. In contrast, the trader who has acted promptly to repurchase his positions has thereby fixed the amount of damages he can recover and is under a relative disadvantage. The long repurchase periods advocated by Letson and Bryant (neither of whom repurchased his positions), 33 and 25 days, respectively, therefore tend to promote speculation and unfairly favor those who stay out of the market over those who reenter.

### B. *Letson's Claim*

Letson had maintained a margined commodities account with Dean Witter since 1977, and a margined securities account since 1976. In 1976 he resided in San Ramon, California, within a few miles of Dean Witter's Walnut Creek office where his accounts were maintained. When he moved to Shelby, Montana, in the fall of 1977, he continued to trade through the Walnut Creek office. He received maintenance calls on his margin accounts and met them in a timely fashion.

During August and September, 1979, Letson bought seven September 1980 Government National Mortgage Authority (GNMA) futures contracts, at prices rang-

ing from $83^2/_{32}$ to $86^{20}/_{32}$ (i.e., $83,062.50 to $86,625.00).[5] Beginning in September 1979, GNMA futures prices began to decline. Between September 24 and October 16, Letson received six maintenance calls and met them by transfers from his securities to his commodities accounts.

As the market continued to decline, and the Chicago Board of Trade increased margin requirements, Letson's account on October 23 again became undermargined. On Wednesday, October 24, at approximately 4:30 p. m. Mountain Time, Letson received a telegram from Dean Witter in New York, advising that his account would be liquidated unless he transmitted $23,800.00 to the Walnut Creek office by 10 a. m. Eastern Time on Thursday, October 25.

When Letson received the telegram, Dean Witter's Walnut Creek office had closed for the day, as had the Montana banks where Letson had deposits. The banks would not reopen for wire transfers until 10 a. m. Mountain Time on Thursday.

Shortly after 8 a. m. Mountain Time, Thursday, October 25, Letson called Donald Piper, his broker in Walnut Creek, who obtained an extension of time within which to meet the maintenance call until 10 a. m. Mountain Time (12 noon Eastern Time). Letson knew that interbank transfers from Montana to California took about five hours and he told Piper that the maintenance call could not be met within the time Dean Witter allowed. At 10:04 a. m. Mountain Time, Letson's seven contracts were liquidated at a price of $74^{13}/_{32}$.

When Letson learned of the liquidation later on Thursday, he called Piper and demanded that Dean Witter reinstate his positions at the liquidation price. On Monday or Tuesday, October 29 or 30, Piper called back to say that Dean Witter rejected the demand. Letson renewed his reinstatement request two weeks later on November 13; the request was again rejected by letter dated November 27. Letson acted on the

---

**5.** GNMA futures are quoted in units of $100,-000. One point equals $1000; one 32nd of a point equals $31.25.

assumption that to obtain reinstatement, he would only have to meet the maintenance calls which he mistakenly thought amounted to $23,800.00; in fact, they totalled $41,345.00. To repurchase his positions in the market would have cost him $39,244.20 (comprised of the $11,244.20 debit in his account and a margin call of $4,000.00 for each of the seven contracts).

The liquidation of Letson's contracts on Thursday occurred when the market had reached a low point. Immediately after the liquidation the price began to rise. It rose each day until Wednesday, October 31 when it reached a high of 77$\frac{1}{32}$; thereafter it fell a few fractions and held steady until November 9 when it rose to 78$\frac{1}{32}$.

Letson was an experienced trader. He held a degree in Business Administration, had occupied various managerial positions in banks and other business enterprises, and had been trading in commodities with Dean Witter for over two years. He had made the decision to stay with his GNMA positions in the expectation that the market would eventually turn and he had the necessary funds to reinstate his positions. He must be presumed to have been aware from the market's movement that the cost of reentering was increasing, placing a premium on prompt action. These facts, standing alone, make three days a reasonable repurchase period.

Additional facts, however, require that the period be extended in this case. Letson made a prompt demand for reinstatement but did not receive a response until three or four trading days later. Under the circumstances of this case, Letson could reasonably have expected that Dean Witter would reinstate his positions and therefore deferred repurchasing them on his own. The repurchase period should therefore begin to run from receipt of the first rejection. That rejection was sufficient to activate Letson's duty to mitigate; he could not defer it by simply renewing a request which had already been rejected.

In addition Letson was under a slight handicap by residing in Shelby, Montana, where he was totally dependent on communication by telephone and had no ready access to other brokerage houses or to market information. These circumstances, combined with the delays necessarily involved in fund transfers from Montana, require the addition of one extra day to what would otherwise be a reasonable time.

On the other hand, Letson cannot be allowed time to consult counsel or watch the market before deciding whether to reenter. For the reasons previously discussed, these are not appropriate considerations where damages are sought for wrongful liquidation of commodities futures positions. Letson previously had made a fully informed decision to retain his GNMA positions. The liquidation did not introduce new facts calling for a second investment decision. Although it may have given rise to a claim for damages against Dean Witter, with respect to which advice of counsel might be sought, the existence of such a claim does not modify the duty to mitigate. That duty would be rendered largely meaningless if time were allowed to seek counsel—time which necessarily would also be used to watch the market and thereby shift the speculative risk to the broker.

Taking all of the foregoing factors into account, the Court determines that a reasonable time within which to reinstate Letson's positions should not exceed four trading days from Tuesday, October 30, the latest date Letson claims he learned that Dean Witter would not reinstate his positions. The highest price reached between October 25, the date of liquidation, and the close of the market on Friday, November 2, (the end of the period) was 77$\frac{1}{32}$ which was reached on October 31.

Should Letson prevail on the liability issue, therefore, his damages will be limited to the difference between the liquidation price of 74$\frac{13}{32}$ and the high of 77$\frac{1}{32}$, 2$\frac{20}{32}$ on each of the seven contracts, or $18,375.[6]

---

**6.** This figure differs from that computed by Letson in his Supplemental Memorandum of

Points & Authorities in Opposition to Defendant's Motion for Summary Judgment, filed

### C. *Bryant's Claim*

Bryant maintained a commodities trading account with Shearson and its predecessors since 1976. His account was with Shearson's San Francisco office but he lived about 100 miles from Fresno where Shearson also had an office. During 1980, Bryant acquired futures in copper, silver, gold, wheat, soybeans and products, plywood, lumber, pork bellies and T-Bonds.

The futures market began to decline sharply in December 1980. On Monday, December 8, Bryant's broker, Charles Grant, told Bryant that he could expect a maintenance call estimated at $28,700 and would "normally [have] five days" to meet it. Bryant then mailed a $20,000 check to Shearson's San Francisco office.

On Tuesday, December 9, with the market still falling, Bryant sold four contracts, reducing his margin requirements by $12,-000. On the morning of Wednesday, December 10, Grant told Bryant he would have to meet all maintenance calls that day or his positions would be liquidated. Bryant was asked to deliver the required funds that afternoon to Shearson's Fresno office. Bryant refused either to deliver the funds or to provide a bank reference. His positions were liquidated that day between 9:25 a. m. and 9:48 a. m. Pacific Time.

Bryant learned at 9:20 a. m. that his accounts were about to be liquidated. Later that day, Bryant stopped payment on the $20,000 check he had mailed on December 8, and contacted the Commodities Futures Trading Commission. He sought legal advice, consulting with an attorney on December 15. He apparently made no demand on Shearson for reinstatement of his positions and took no steps to mitigate damages.

The prices of Bryant's positions rose slightly after the liquidation on Wednesday, December 10. However, on Thursday prices fell, many to well below the liquidation prices. On Friday prices rose but on average remained close to the level of the liquidation prices. On Monday, December 15, prices again rose across the board and prices for all but two of the positions exceeded the liquidation price. During the remainder of the week of December 15, prices of the various positions fluctuated, but remained for the most part somewhat above the liquidation price.

Bryant was a college graduate and an experienced trader. He had supervised the commodities trading and hedging activities of his father's farming corporation for approximately six years. Seven months before the liquidation at issue here, he became a full-time trader in securities, options and commodities. He had had an account with Shearson and its predecessors for about four years.

Nothing prevented Bryant from taking steps immediately to reenter the market. That he was capable of taking prompt protective action is shown by his other actions on December 10 and thereafter. He had access to sufficient funds to reinstate his positions. By Friday, December 12, the third trading day following the liquidation (including the day of liquidation), Bryant could observe a general price rise above the liquidation prices. These circumstances, plus the uncertainties inherent in further delay over a weekend, made prompt action imperative. Therefore a repurchase period of three trading days, ending Friday, December 12, is reasonable in this case. This period is consistent with Bryant's own expectation. His broker had told him five days earlier, on Monday, December 8, when Bryant knew that the maintenance call was impending and began to act on it, that he would normally have five days to meet it.

11/20/81. In the Declaration of Ann Rankin, filed therewith, damages based on the reinvestment price of $77^{1}/_{32}$ are computed to be $18,-340.00. However, this computation appears to be based on the assumption that $^{1}/_{32}$ of a point equals $31.00; actually $^{1}/_{32}$ of a point equals $31.25. Using the latter computation, Letson's damages would be $18,375. Dean Witter, us-

ing the prices of $77^{1}/_{32}$ and $74^{13}/_{32}$, computes damages as $17,937 in their Supplemental Memorandum filed November 20, 1981. The difference between Dean Witter's damage computation and the court's is one of $438, a difference of almost exactly $^{2}/_{32}$ of a point per contract, and presumably results from an arithmetical error.

Bryant makes various contentions in support of a longer period, none of which is persuasive. Bryant argues that he lacked the funds necessary to repurchase his positions; but since he simultaneously maintains (as he must to sustain this cause of action) that he had the funds to meet the maintenance calls, he necessarily had sufficient funds to reestablish his positions on margin.[7] His argument that no other broker would have accepted an order to purchase these positions on margin because of Bryant's impaired net worth is sophistry— Bryant had a duty at least to try to mitigate, yet he made no attempt whatever, not even through Shearson or Merrill Lynch where he had accounts.

■ Bryant charges Shearson with bad faith but alleges no facts having any bearing on Bryant's reinvestment decision. He made no reinstatement demand and hence can attribute no part of his inaction to any delayed response.

For the reasons previously discussed, Bryant is not entitled to time to consult counsel or watch the market before making his decision whether to reenter the market.

Should Bryant prevail on his claim, he would be entitled to damages computed on the basis of the highest prices reached by his contracts between the liquidation and the close of trading at the end of the week on Friday, December 12. These damages amount to $11,521.50 as computed in the Appendix to this memorandum of opinion.

### D. *Other Damage Theories*

Bryant also contends that he is entitled to damages incurred prior to liquidation by reason of Shearson's not "disclosing" to him that it might liquidate his positions without allowing him time to meet a margin call. He argues that had he known by December 8, 1980, that Shearson might liquidate his positions without reasonable notice, he would have sold his positions then. He argues for recovery of the difference between higher prices he could have obtained on December 8, 1980, and the prices at which his positions were actually sold on December 10, 1980. Letson advanced a similar argument but has not pursued it.

■ Claims that but for misrepresentations relating to the nature of the agreement between the broker and the trader the latter would have sold out sooner, thereby avoiding losses in the declining market, must be rejected. In the first place, such claims based upon a hypothetical decision to sell on a particular (and most favorable) date are far too speculative to support damage recovery. No facts have been advanced which would provide objective evidence of such a decision. *See Hornblower & Weeks-Hemphill Noyes v. Lazere,* 301 Minn. 462, 222 N.W.2d 799, 803 (1974).

■ Moreover, any alleged misrepresentations went to the nature of the broker/investor agreement, and not to the state of the market or the quality of the investment. Any pre-liquidation declines in Letson's and Bryant's accounts were attributable solely to market moves of which the traders were as aware as their brokers. Any resulting losses were not proximately caused by any acts of the brokers. Letson and Bryant were in no way prevented by any representation or concealment by their brokers from selling out in the falling market prior to liquidation. Damages allegedly resulting from the liquidation itself must be differentiated from damages resulting from Shearson's preliquidation conduct. To the extent the market rose immediately after Shearson's liquidation, Bryant was damaged because he was involuntarily excluded from the market by Shearson and had either to forgo the benefit of the price rise or, to mitigate damages, buy in at a higher price. Losses incurred prior to the liquidation, however, are Bryant's responsibility since Shearson did nothing to prevent him from liquidating his positions. Shearson made no misrepresentation and concealed no facts relevant to investment decisions by Bryant.

Cases such as *Gould v. American-Hawaiian Steamship Company,* 535 F.2d 761 (3rd

---

**7.** See note 1, *supra.*

Cir. 1976), and *Kaufmann v. Delafield*, 224 App.Div. 29, 229 N.Y.S. 545 (N.Y.Sup.Ct. 1928) relied on by Bryant, are distinguishable. In *Gould*, shareholders recovered damages for lost opportunities, having been lulled into inaction regarding their investments by a misleading proxy statement. The misrepresentation went to the nature and value of the investment itself since the proxy statement did not accurately represent the disparate treatment of shareholders in a proposed merger agreement. In *Kaufmann*, an investor was allowed to recover damages sustained when he retained his stock as a result of misrepresentations by his broker as to its value. In both cases, investors were prevented from making informed investment decisions as a result of having been misled as to the quality or value of their investments. Bryant, however, was misled if at all only by alleged misrepresentations as to the nature of the arrangements between himself and Shearson, which had nothing to do with the value of his investments or his ability to make investment decisions. Any subsequent decline in value of his positions was not proximately caused by Shearson's acts or omissions.

### V. *Conclusion*

For the foregoing reasons, the motions of Dean Witter and Shearson for partial summary judgment are granted on the issue of damages as follows: Letson is limited in his action against Dean Witter to recovery of damages, if any, in the amount of $18,375; Bryant is limited on his counterclaim against Shearson to recovery of damages, if any, in the amount of $11,521.50. The motions for summary judgment are denied in all other respects.

These actions are set for status conference on February 19, 1982, at 10 a. m.

IT IS SO ORDERED.

### APPENDIX

Following is a list of Bryant's thirteen commodities positions liquidated by Shearson, with their prices at the times relevant to computation of damages, and the damages which result using these prices. The term "high price" in these computations means the highest price reached by the contracts between the time of the entry of the liquidation order on December 10 and the close of trading on December 12. The times cited are Pacific Standard Time.

The results reached by the Court differ from those reached by the parties in some instances. Shearson's method of damage computation is incorrect in that it uses the highs reached on a day by day basis, rather than the highs reached over a given period as the damage formula requires. Bryant, it appears, has made some arithmetical errors.

Using the factual data submitted by the parties, and the computation formula described in the foregoing opinion, the Court reaches the following conclusions on the issue of damages.

#### (1) March 1981 Copper (2 Contracts)

Each contract was for 25,000 pounds. Prices are quoted in cents per pound.

| | | |
|---|---|---|
| High Price | (12/12/80) | 83.90 |
| Liquidation Price (12/10/80, 9:43 a.m.) | | 83.00 |
| Difference | | .90 cents per pound |

Damages equal $.0090 per pound, times 25,000 pounds, times two contracts, or . . . . . . . . . . . . . . . . . . $450.00

#### (2) May 1981 Copper (2 Contracts)

Each contract was for 25,000 pounds. Prices are quoted in cents per pound.

| | | |
|---|---|---|
| High Price | (12/12/80) | 86.30 |
| Liquidation Price (12/10/80, 9:26 a.m.) | | 85.75 |
| Difference | | $.0055 cents per pound |

Damages equal $.0055 per pound, times 25,000 pounds, times two contracts, or . . . . . . . . . . . . . . . . . . $275.00

#### (3) March 1981 Silver (1 Contract)

Each contract was for 5,000 ounces. Prices are quoted in cents per ounce.

| | | |
|---|---|---|
| High Price | (12/11/80) | 1598 * |
| Liquidation Price (12/10/80, 9:25 a.m. London Market) | | 1545 |
| Difference | | 53 cents per ounce |

Damages equal $.53 per ounce, times 5,000 ounces, times one contract, or . . . . . . . . . . . . . . . . . . . . . $2,650.00

*Shearson states that at 6:53 a.m. PST, on December 10, silver was "down the limit" and trading on the New York Commodity Exchange stopped. Shearson liquidated the accounts on the London market at $15.45 per ounce. According to Shearson, trading did not resume again in New York until 12/12/80. Yet Bryant quotes a high price of 1598 reached on 12/11/80. Construing the facts in the light most favorable to Bryant, this price is used.

#### (4) April 1981 Gold (3 Contracts)

Each contract was for 100 ounces. Prices are quoted in dollars per ounce.

| | | |
|---|---|---|
| High Price | (12/12/80) | 607.50 |
| Liquidation Price (12/10/80, 9:25 a.m.) | | 601.00 |
| Difference | | 6.50 dollars per ounce |

### (4) April 1981 Gold (3 Contracts)—Continued

Damages equal $6.50 per ounce, times 100 ounces, times three contracts, or ...................... $1,950.00

### (5) June 1981 Gold (2 Contracts)

Each contract was for 100 ounces. Prices are quoted in dollars per ounce.

| | | |
|---|---|---|
| High Price | (12/12/80) | 625.00 |
| Liquidation Price (12/10/80, 9:25 a.m.) | | 620.00 |
| Difference | | 5.00 dollars per ounce |

Damages equal $5.00 per ounce, times 100 ounces, times two contracts, or ...................... $1,000.00

### (6) March 1981 Wheat (10M Contracts)

Prices are quoted in dollars per bushel.

| | | |
|---|---|---|
| High Price | (12/10/80, 10:00 a.m.) | 4.85 |
| Liquidation Price (12/10/80, 9:45 a.m.) | | 4.83 |
| Difference | | .02 dollars per bushel |

Damages equal $.02 per bushel times 10,000 bushels, or, ............................. $200.00

### (7) May 1981 Soybeans (5M Contracts)

Prices are quoted in cents per bushel.

| | | |
|---|---|---|
| High Price | (12/10/80, 9:57 a.m.) | 846 |
| Liquidation Price (12/10/80, 9:45 a.m.) | | 839½ |
| Difference | | 6½ cents per bushel |

Damages equal $.065 per bushel, times 5,000 bushels, or ............................. $325.00

### (8) May 1981 Soybean Meal (2 Contracts)

Each contract was for 100 tons. Prices are quoted in dollars per ton.

| | | |
|---|---|---|
| High Price | (12/10/80, 9:57 a.m. | 246.00 |
| Liquidation Price (12/10/80, 9:47 a.m.) | | 244.10 |
| Difference | | 1.90 dollars per ton |

Damages equal $1.90 per ton, times 100 tons, times two contracts, or ............................. $380.00

### (9) July 1981 Soybean Oil (5 Contracts)

Each contract was for 60,000 pounds. Prices are quoted in cents per pound.

| | | |
|---|---|---|
| High Price | (12/10/80, 9:50 a.m.) | 26.85 |
| Liquidation Price (12/10/80, 9:47 a.m.) | | 26.75 |
| Difference | | .10 cents per pound |

Damages equal $.0010 per pound, times 60,000 pounds, times five contracts, or ...................... $300.00 *

* Bryant claims in his 1/14/82 memorandum that damages for liquidation of this position amount to $30.00. Bryant appears to have made an arithmetical error.

### (10) July 1981 Plywood (5 Contracts)

Each contract was for 76,032 square feet. Prices are quoted in dollars per 1000 square feet.

| | | |
|---|---|---|
| High Price | (12/10/80, 10:54 a.m.) | 208.00 |
| Liquidation Price (12/10/80, 9:48 a.m.) | | 203.00 * |
| Difference | | 5.00 dollars per 1000 square feet |

Damages equal $5.00 per 1000 square feet, times 76,032 square feet, times 5 contracts, or ......... $1,900.80 **

* Bryant states in his declaration that the liquidation price was 203.00; Shearson states that it was 203.80. On motion for summary judgment, the court construes the facts in the light most favorable to, the party opposing summary judgment, and therefore Bryant's price is used here. If, however, Shearson is correct that the liquidation price was 203.80, damages would be $4.20 per 1000 square feet, times 76,032 square feet, times 5 contracts, or $1,596.67.

** Bryant computes damages at $.05 less, apparently due to rounding.

### (11) June 1981 T-Bonds (2 Contracts)

Each contract was for $100,000.00. Prices are quoted so that one point equals $1,000, and one thirty-second of a point is $31.25.

| | | |
|---|---|---|
| High Price | (12/10/80, 10:49 a.m.) | 68²⁷/₃₂ |
| Liquidation Price (12/10/80, 9:48 a.m.) | | 68¹²/₃₂ |
| Difference | | ¹⁵/₃₂ of $1,000 |

Damages equal ¹⁵/₃₂ of $1,000 times 2 contracts, or $937.50

### (12) May 1981 Lumber (5 Contracts)

Each contract was for 130,000 board feet. Prices are quoted in dollars per 1000 board feet.

| | | |
|---|---|---|
| High Price | (12/10/80, 10:01 a.m.) | 190.00 |
| Liquidation Price (12/10/80, 9:48 a.m.) | | 188.60 |
| Difference | | 1.40 dollars per 1000 board feet |

Damages equal $1.40 per 1000 board feet, times 130,000 board feet, times five contracts, or ........ $910.00

### (13) May 1981 Pork Bellies (2 Contracts)

Each contract was for 38,000 pounds. Prices are quoted in cents per pound.

| | | |
|---|---|---|
| High Price | (12/10/80, 9:51 a.m.) | 65.57 |
| Liquidation Price (12/10/80, 9:44 a.m.) | | 65.25 |
| Difference | | .32 cents per pound |

Damages equal $.0032 per pound, times 38,000 pounds, times two contracts, or ...................... $243.20

Summary of Damages:

| | | |
|---|---|---|
| (1) | March 1981 Copper | $ 450.00 |
| (2) | May 1981 Copper | $ 275.00 |
| (3) | March 1981 Silver | $2,650.00 |
| (4) | April 1981 Gold | $1,950.00 |
| (5) | June 1981 Gold | $1,000.00 |
| (6) | March 1981 Wheat | $ 200.00 |
| (7) | May 1981 Soybeans | $ 325.00 |
| (8) | May 1981 Soybean Meal | $ 380.00 |
| (9) | July 1981 Soybean Oil | $ 300.00 |
| (10) | July 1981 Plywood | $1,900.80 |
| (11) | June 1981 T-Bonds | $ 937.50 |
| (12) | May 1981 Lumber | $ 910.00 |
| (13) | May 1981 Pork Bellies | $ 243.20 |
| | TOTAL DAMAGES | $11,521.50 |