MODERN SETTINGS, INC. and Binder and Binder, as attorneys for Modern Settings, Inc., Plaintiffs,

v.

PRUDENTIAL–BACHE SECURITIES, INC., and Prudential–Bache Metal Co., Inc., Defendants.

No. 83 Civ. 6291 (RLC).

United States District Court, S.D. New York.

Aug. 7, 1990.

Jaffe and Asher, New York City, for plaintiffs; Peter Jaffe, of counsel.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for defendants; John M. Friedman, Jr., Susan C. Meaney, of counsel.

## REVISED OPINION

ROBERT L. CARTER, District Judge.

This proceeding and determination are expected to bring this prolonged controversy to a final termination. The history of this case is set forth in detail in the court's prior opinions—602 F.Supp. 511 (1984); 603 F.Supp. 370 (1985); 629 F.Supp. 860 (1986); No. 83 Civ. 6291, slip op. (June 2, 1988) (as amended, 1988 WL 49056, 1988 U.S. Dist. Lexis 5059); 709 F.Supp. 70 (1989); 109 B.R. 605 (1989)—with which familiarity is assumed. Accordingly, only those facts necessary to understand the damages and set-off issues now being addressed will be regurgitated in this opinion.

In 1983, Harry Binder, majority shareholder and president of Modern Settings, Inc., decided that the company should expand into the finished goods side of the jewelry business and he aggressively solicited orders for the coming Christmas season. His efforts produced orders in hand of about $800,000, and he testified that the jewelry business is such that had he filled these orders, he would have been able to generate additional orders of some $2,400,000. However, due to actions of defendants Prudential–Bache Metal Co., Inc. and Prudential–Bache Securities, Inc. (together, "Prudential–Bache"), this anticipated business growth did not come to fruition.

The origin of this dispute is centered on an agreement between the parties whereby Modern Settings obtained gold on consignment from Prudential–Bache and in turn maintained a margin securities account (the "account") with it, the value of the securities account being 120% of the value of the consigned gold. *See, Modern Settings v. Prudential–Bache Sec., supra,* 602 F.Supp. at 512–13. The facts show that Prudential–Bache misvalued Modern Settings' account by some $300,000, and until August, 1983, Modern Settings thought its account was worth $300,000 more than it actually was. At this same time, Prudential–Bache was wrongfully trading in Modern Settings' account. These matters came to a head on August 23, 1983, when Modern Settings' account was wrongfully liquidated and it, along with Binder's personal account and those of other family members, was frozen until February 15, 1985. Because of these actions, Modern Settings was unable to obtain the gold it needed to fill the orders in hand, and the projected expansion into the finished goods area was doomed. Instead, there was a steady contraction of business and a succession of name changes—first, Mr. Wemmick, Ltd., doing business as Modern Settings/Findings/Strikings/Castings, and, later, The Mod Set Ltd.—until bankruptcy was declared in 1985.

The court has determined that Modern Settings is entitled to recover for unauthorized trading in its account and the parties have stipulated that these damages come to $134,849.69.

■ The court also has determined that Modern Settings is entitled to recover for wrongful liquidation. Here the parties are at odds as to the amount of damages. Prudential–Bache contends that the court should apply the traditional measure of damages utilized for recovery for this wrong: the difference between the price obtained at liquidation and the highest intermediate price between notice of conversion and a "reasonable period" thereafter, where the "reasonable period" is construed to mean a time span of three to five days. *Gallagher v. Jones,* 129 U.S. 193, 200, 9 S.Ct. 335, 337, 32 L.Ed. 658 (1889); *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 972 (2d Cir.1987). The parties have stipulated that the allowable damages under this formula amount to $105,000.

The rationale for this formulation is to approximate the price at which the injured investor might have sold his positions profitably, absent the involuntary liquidation, and to reflect his duty to mitigate damages "taking into account that the [investor] has no assurance that he would have been able to repurchase during the reasonable period for less than the highest intermediate price." *Letson v. Dean Witter Reynolds, Inc.,* 532 F.Supp. 500, 503 (N.D.Cal.1982), *aff'd. sub nom. Shearson Loeb Rhoades, Inc. v. Bryant,* 730 F.2d 769 (9th Cir.1984) *(mem)* (citing, *inter alia, Arrington v. Merrill Lynch, Pierce, Fenner & Smith,* 651 F.2d 615, 620 (9th Cir.1981); *Havlik v. Merrill Lynch, Pierce, Fenner & Smith,* [1977–1980 Transfer Binder] Comm.Fut.L. Rep. (CCH) ¶ 20,544 at 22,243 (CFTC 1978)).

In theory, the "reasonable period" represents the time during which the investor is involuntarily removed from the market and is presumably attempting re-entry. The underlying assumption is that any decision not to reinvest is a voluntary one, based on an assessment of the post liquidation market. *See, Chipser v. Kohlmeyer & Co.,* 600 F.2d 1061, 1067–68 (5th Cir.1979) (holding that failure to reinvest after discovery of the wrongful liquidation constituted a decision to get out of the market rather

than risk further loss and that no damages were permitted for increases in the value of the commodities after plaintiff was deemed to have decided to leave the market).

However, as a practical matter the position of the *Letson* court and others that "[f]ailure to reenter within the reasonable time period is deemed to be a decision to stay out," *Letson, supra*, 532 F.Supp. at 503, seems unrealistic in cases such as this one where the investor is without funds to reinvest due in part to the wrongful acts of the defendant. Given that Modern Settings' decision not to reinvest was mandated by Prudential–Bache's freezing of its account, fairness suggests that the "reasonable period" must be linked to Modern Settings' ability to reinvest. Moreover, the Court of Appeals has expressly refused to establish a definite time span as the "reasonable period" in every case. *Katara v. D.E. Jones, supra*, 835 F.2d at 973 ("[w]e decline at this juncture to provide a hard and fast rule on this question, since the appropriate time period varies somewhat with the facts of the case."); *Schultz v. Commodity Futures Trading Com.*, 716 F.2d 136, 140 (2d Cir.1983) ("[t]hus, what constitutes a reasonable period between the act complained of and the time when re-entry into the market would be both warranted and possible will vary from case to case . . ."). *See also, Cauble v. Mabon Nugent & Co.*, 594 F.Supp. 985, 996 (S.D.N.Y.1984) (Sofaer, J.) (court implicitly recognized that where a defendant's wrongdoing prevents the plaintiff's reinvestment and the plaintiff lacks the financial resources to invest with new funds, the period for measuring damages would be extended).

However, regarding this case, it is significant that the primary purpose of the account was to enable Modern Settings to obtain the gold it needed to run its business, not to enable it to invest. With disclosure of the $300,000 error in its account, Modern Settings was below the $900,000 minimum in equity it was required to maintain in the account at all times pursuant to the gold consignment agreement in order to maintain the 1500 ounce consignment of gold. Although, as indicated above, Modern Settings was prevented from reinvesting until February 15, 1985, when the account was unfrozen, this did not so much prevent Modern Settings from investing in the market as prevent the accumulation of gold for maintenance of the business as a going concern. This, however, involves a different measure of damages, discussed below, and, accordingly, the three (3) to five (5) day "reasonable period" seems appropriate in this case and damages of $105,000 are awarded for wrongful liquidation. The guiding principle regarding damages in this area is to provide compensation for actual loss, *see, e.g., Gallagher v. Jones, supra*, 129 U.S. at 200, 9 S.Ct. at 337; *Schultz v. Commodity Futures Trading Com., supra*, 716 F.2d at 139, and $105,000 meets that yardstick.

The final item of damages, the diminution in the value of Modern Settings' business, is the most controversial. Both sides presented expert testimony on the issue and, while there was agreement on methodology, the final figures presented varied significantly. Modern Settings' expert valued Modern Settings at over $3,000,000, while Prudential–Bache's expert valued it at $1,420,000.

Modern Settings' expert reached his conclusions by using three accepted approaches to valuation: the income approach, the market approach and the net worth approach. Prudential–Bache's expert used only the income approach and the net worth approach. The testimony at trial centered chiefly on the income approach, a methodology using a discounted cash flow analysis in which net cash flows are forecast for a number of years and then discounted back to present value. The extreme difference in the conclusion of each side as to the final value of the company is attributable in part to disagreement as to the correct sales growth rate (15% for 1984, 1985, 1986, and 12% for 1987 and 1988 according to Modern Settings, and only 8% according to Prudential–Bache) and as to the correct cost of goods sold percentage (58% according to Modern Settings and 66% according to Prudential–Bache). The two sides also quarrelled over the appropriate

discount rate (23% according to Modern Settings and 25% according to Prudential–Bache) and regarding whether to use net cash flow or gross cash flow to determine terminal value.

The sales growth rate of 15% and 12% used by Modern Settings appears to be a far fairer assessment than the 8% suggested by Prudential–Bache which took no account of inflation. The 66% cost of goods sold figure suggested by the defendants seems far more accurate than the figure suggested the plaintiff. The court uses net cash flow to determine terminal value, since the use of gross cash flow would result in expanding terminal value unrealistically.

In its original opinion, the court based its calculations on the wrong exhibit—Modern Settings' Exhibit 30 in which the estimate of sales was extremely high.[1] These sales figures were revised downward in plaintiff's Exhibit 31, which plaintiff's expert presented as a more accurate and more reliable formulation than Exhibit 30 and which the court should have used, rather than Exhibit 30, as a base in reaching its determination on this phase of the case. Defendants have provided the court with a modified version of Exhibit 31, Exhibit C, Defendants' letter, dated July 19, 1990, and those figures, with the indicated exceptions, are being used in this amended opinion.

Based on the indicated computations, the cost of goods sold calculated in 1984 is $2,095,959; $2,410,353 in 1985; $2,771,905 in 1986; $3,104,534 in 1987; $3,477,078 in 1988; and $3,824,786 in 1989.

Total costs and expenses for 1984 are $2,947,784; $3,354,890 for 1985; $3,813,222 for 1986; $4,234,652 for 1987; $4,702,411 for 1988; and $5,146,535 for 1989. Operating income of $227,911 is projected for 1984; $297,159 for 1985; $386,634 for 1986; $469,187 for 1987; $565,889 for 1988; and $648,596 for 1989. Provision for income tax is $117,146 in 1984, leaving a net income of $110,765; $152,740 in 1985, leaving a net income of $144,419; $198,730 in 1986, leaving a net income of $187,904; $241,162 in 1987, leaving a net income of $228,025; $290,867 in 1988, leaving a net income of $275,022; and $333,378 in 1989, leaving a net income of $315,218.

Taking the above net income calculations and adjusting them to account for deprecia-

1. The court issued an opinion in this case on July 13, 1990. By letter dated July 19, 1990, defendants pointed out that Exhibit 30, which the court had inadvertently used as the basis for its calculation in that opinion, had been received at trial with the understanding that it had been modified by Exhibit 31. In this latter exhibit, the plaintiff's expert revised downward the sales calculations appearing in Exhibit 30. This meant that the court's calculations were incorrect and had to be revised.

Defendants presented their own version of Exhibit 31, using the sales figures of Exhibit 31 but the cost of goods sold percentage and the discount rate used in the original opinion. *See* Exhibit C, defendants' letter dated July 19, 1990. In this revised opinion, the court has used defendants' calculations as set forth in their Exhibit C with several exceptions as indicated below.

Plaintiff's expert used a 25% discount rate in Exhibit 30. Defendants' expert adopted that rate as well, and the court used the 25% rate in its original opinion. Plaintiff's expert, however, applied a 23% discount rate to his more conservative estimate of sales in his Exhibit 31 calculations. Defendants have used the conservative sales estimate in their formulation, but have continued to use a 25% discount rate. Since the estimate of sales in Exhibit 31 and in defendants' calculations which the court has adopted in substantial part is a more conservative projection than plaintiff's Exhibit 30 provided, less risk is involved. Therefore, it seems fair to use a 23% discount rate which reflects a lesser degree of risk.

Defendants in their revised Exhibit 31 have taken, unchanged, the court's calculation of $180,000 as 1989 principal payback figure. However, that calculation was derived from Exhibit 30. Since defendants' revised Exhibit 31 has scaled all of the figures on Exhibit 30 downward, this 1989 principal payback figure must also be scaled downward. The court's revised calculation of the 1989 principal payback figure is now $128,000, and the figure for 1989 net cash flow is now $120,085.

In addition, while defendants' revised calculations lower the value of Modern Settings prior to liquidation, they utilize the post-liquidation value the court placed on Modern Settings when it was dealing with the higher estimates in Exhibit 30. Now that we are using figures that deflate plaintiff's pre-liquidation value, it seems only appropriate that its post-liquidation value should also be scaled back. Therefore, the court values Modern Settings after liquidation at $200,000, instead of $350,000 as was done in its original calculations.

tion, working capital additions, capital expenditures, proceeds from new debt and payback of principal, the net cash flow figures are $954,218 for 1984, coming to $860,418 when discounted to present value at 23%; $49,007 in 1985, totalling $35,927 when discounted to present value, using a discount rate of 23%; $55,868 in 1986, totalling $33,297 when discounted to present value; $83,944 in 1987, totalling $40,671 when discounted to present value; and $90,203 in 1988, totalling $35,531 when discounted to present value. The annuity of cash flows therefore is $1,005,844. The net cash flow for 1989 is $120,085, giving a terminal value of $923,731 and therefore a reversion value of $328,109.[2] The combination of the annuity of cash flows and the reversion value gives a total value of $1,333,953 for Modern Settings under the income approach to valuation.

I agree with Prudential–Bache that Modern Settings had some value after the liquidation, but it did not thrive in that aftermath. As indicated, the court places plaintiff's post liquidation value at $200,000. Accordingly, after subtracting the value after liquidation, Modern Settings is awarded damages of $1,113,953 for diminution of business. In sum, Modern Settings' total damages for unauthorized trading, wrongful liquidation and diminution of business is $1,353,802.69.

I have not attempted to apply the other methodologies since the experts reached virtually the same conclusions under the other approaches used.

Regarding Prudential–Bache's set-off claim for the unpaid for gold, there is dispute as to the date on which the set-off should be calculated and the amount. Modern Settings' arguments on this issue are not persuasive. The value of the 1500 ounces of gold which Modern Settings had on consignment at the time of the liquidation and which was not paid for should be calculated on the basis of the price on August 23, 1983. The parties have stipulated that the price was $426.50 per Troy ounce on that date. Accordingly, Prudential–Bache is entitled to a set-off of $639,750 for those 1500 ounces of gold.

In addition, Prudential–Bache advanced 405.74 ounces of gold to Modern Settings pursuant to a letter agreement dated August 24, 1983. There is no dispute that this gold was never paid for and it is stipulated that the proper price per Troy ounce for this gold is $428. Modern Settings contends that it would be unjust to grant Prudential–Bache a set-off for this gold since Prudential–Bache would then be accorded a preference over other of Modern Settings' creditors. This argument, if it has any validity, should be made in the Bankruptcy Court, not here, and, assuming that it could be made here, should be made by the Trustee, who has not appeared in these proceedings since the outset. Therefore, the set-off available to Prudential–Bache for this gold is $173,656.72. There is also some $3,198 in unpaid consignment fees due Prudential–Bache. In sum, the total set-off allowed Prudential–Bache is $816,604.72.

Accordingly, the net recovery for Modern Settings is $537,197.97, plus interest of 9% from August 23, 1983.

IT IS SO ORDERED.

---

**2.** Terminal value, the equity value of Modern Settings at the end of the forecasted holding period, is computed by dividing net cash flow for the year 1989 ($120,085) by the difference between the discount rate (23%) and the forecasted 10% annual growth rate for cash flow beginning after the five year holding period.

The 10% growth rate for cash flow was suggested by the plaintiff, *see,* Exhibit 30 at 27, and adopted by the defendants in their recent submission to the court. The reversion value is simply the discounted present value of the terminal value.