**Burton SCHULTZ, Petitioner,**

v.

**COMMODITY FUTURES TRADING COMMISSION, Incomco, Inc. and Philip M. Smith, Respondents.**

**No. 1215, Docket 83–4018.**

United States Court of Appeals, Second Circuit.

Argued May 9, 1983.
Decided Aug. 24, 1983.

---

**7.** *Griffin v. Illinois,* 351 U.S. 12, 24 (1956) (Frankfurter, J., concurring).

Norman E. Henkin, New York City, for petitioner.

Maureen Donley Hoopes, Washington, D.C. (Dennis A. Dutterer, Gen. Counsel, Commodity Futures Trading Com'n, Kenneth M. Raisler, Deputy Gen. Counsel, Washington, D.C., of counsel) for respondents.

Before OAKES, CARDAMONE and PIERCE, Circuit Judges.

CARDAMONE, Circuit Judge:

There are two matters pending before us in the present case. The first is petitioner Burton Schultz's appeal from an order of the Commodity Futures Trading Commission which dismissed Schultz's claim against respondents Incomco, Inc. and Philip M. Smith, Incomco's president, for reparation arising from respondents' alleged violation of the Commodity Exchange Act (Act). The second is the Commission's motion to have the case remanded to itself for consideration of a theory of damages it claims it had not previously addressed. Because the Commission failed to apply the appropriate legal analysis, we grant the motion to remand and set forth the standards and procedure which should be employed on remand and in assessing similar claims in the future.

I

On June 6, 1979 Schultz opened a commodity futures trading account with Incom-

co by depositing a stock certificate worth $4,000 with Smith. There is no evidence in the record indicating whether Smith had or needed to have the power to negotiate the stock certificate, if necessary, to insure that Schultz's account was properly margined. The value of the certificate did not appear as a credit on Schultz's periodic account statements.

No one had authority to make trades for Schultz's account without his personal authorization. Incomco executed trades authorized by Schultz during June and July, 1979. The gross equity attributable to these profitable trades appeared on Schultz's statements.

At petitioner's direction, Incomco bought two August 1980 pork belly futures contracts for Schultz's account, one each on June 14 and 27, 1979 at $48.40 and $45.80 respectively. By August 14 these two open positions had incurred losses to the extent that the gross equity balance of $3,436.60 in Schultz's account actually had a net worth of less than $500. This situation caused Schultz's account to be undermargined. No margin call was made on petitioner and no attempt was made to negotiate the deposited stock certificate in order to satisfy this undermargined status. Nevertheless, on August 15 and 16, 1979 Smith liquidated Schultz's August 1980 pork belly futures contracts at $42.25 and $42.85 respectively, leaving a negative net balance of $60.90 in Schultz's account.

Petitioner received a confirmation of this purchase and sale transaction on August 17, 1979, but asserts that he did not understand its significance. When the transaction was reflected on his next account statement, he went to Incomco's offices and retrieved his stock certificate. On October 5, 1979, he filed a claim with the Commission against Smith and Incomco for reparation under section 14 of the Act, 7 U.S.C. § 18 (1976 & Supp. V 1981), claiming that the unauthorized sale violated section 4b of the Act, 7 U.S.C. § 6b (1976) and that he was damaged as a result. Though Schultz stated in his claim that it was "difficult for [him] to fix actual damages," he asked for $3,436.60,

representing the equity in his account immediately prior to the sale of his pork belly futures contracts. He noted that within the month after the unauthorized closeout his account would have had a net worth of between $1,000 and $5,000.

Since the alleged damages did not exceed $5,000, the claim was adjudicated under the Commission's summary proceeding rules, 17 C.F.R. §§ 12.91–12.95 (1982), and all proof was submitted in documentary form. *See* 7 U.S.C. § 18(b) (1976) & Supp. V 1981). During the pendency of Schultz's claim, Incomco filed a voluntary petition in bankruptcy and all reparation proceedings against that company were stayed, but the Commission continued with its determination of the charge as against Smith.

On October 30, 1981 a Hearing Officer issued an Initial Decision finding that the subject sales constituted unauthorized trades in violation of section 4b(A) of the Act, and ordering Smith to pay Schultz damages of $3,436.60 plus interest and costs. Acting *sua sponte, see* 17 C.F.R. § 12.95(e)(2) (1982), the Commission notified the parties on December 2, 1981 that it would review the Initial Decision in order to consider the following: whether the respondents' conduct constituted a violation of the Act, whether there was a causal nexus between this conduct and the damage award made by the Hearing Officer, and whether Schultz had a duty to attempt to reenter the market in order to mitigate his damages. The parties were invited to brief these issues but neither responded.

In a decision dated January 17, 1983 the Commission ruled that it "need not reach the question whether [respondents'] conduct violated the Act" because it found no causal connection between this conduct and Schultz's losses. It attributed loss of the $3,436.60 equity in Schultz's account to his retention of the unprofitable pork belly futures contracts, and found that respondents' allegedly unauthorized liquidation did no more than realize the loss already incurred by petitioner's retention of these losing positions. As for Schultz's claim of possible profits of from $1,000 to $5,000 in the

month following liquidation, the Commission stated that Schultz's failure to attempt to mitigate his damages by reentering the market, or to prove that it was financially or otherwise unreasonable for him to do so, precluded recovery for potential lost profits. It summarized its findings by stating that neither Schultz's prior market losses (of the $3,436.60 equity in his account) nor subsequent lost profits (of $1,000 to $5,000) was causally related to respondents' liquidation of Schultz's open positions. The Commission thereupon dismissed petitioner's complaint.

Schultz appealed directly to our court under 7 U.S.C. § 18(g) (1976). The Commission moved for a remand, claiming that Schultz presented for the first time on appeal the argument that he could recover damages incurred between the time he first learned of the liquidations and the time that he could have reestablished his positions by reentering the market. The Commission argues that it should first have an opportunity to consider this theory of damages.

## II

■ We shall address the substantive appeal and the motion for remand together. But, as a preliminary matter, we are troubled by the Commission's failure to consider the issue of liability before it examined the propriety of awarding reparation damages. In pertinent part, section 14(c) of the Act directs that "on complaints where damages claimed do not exceed the sum of $5,000 ..., the Commission shall determine whether or not the respondent has violated any provision of this chapter...." 7 U.S.C. § 18(c) (1976 & Supp. V 1981). Were this not sufficiently clear, section 14(e), entitled "Reparations," states that "If ... the Commission determines that the respondent has violated any provision of this chapter ..., the Commission shall ... determine the amount of damage, if any, to which [the complainant] is entitled as a result of such violation." 7 U.S.C. § 18(e) (1976). It therefore seems plain that the first issue that should be addressed in a reparation claim is whether the respondent violated the Act. Only if and when the Commission determines that a respondent has in fact violated the Act should it turn to the issue of damages.

Our criticism on this point is not intended merely as an exercise in procedural nitpicking, but as an aid to speedy and final adjudication. For if we conclude that the Commission's ruling on damages was incorrect, yet find sufficient evidence in the record from which they may be calculated, the case must nonetheless be returned to the Commission for its ruling on liability. This kind of piecemeal decision-making could readily be eliminated if the Commission would simply follow the procedural mandate of the statute.

## III

Turning to the issue of damages, compensation for actual loss is the long-recognized general standard used to measure damages. *See, e.g., Hoyt v. Fuller,* 104 F. 192, 193 (8th Cir.1900). Nearly a hundred years ago the Supreme Court set forth the proper rule to be applied in calculating damages when an item of fluctuating value is wrongfully sold, converted or not purchased when it should have been. In *Galigher v. Jones,* 129 U.S. 193, 199–202, 9 S.Ct. 335, 337–338, 32 L.Ed. 658 (1889), the Court had before it a case in which Jones, a stockbroker bound to execute his principal's orders, failed to purchase certain shares at the request of Galigher, his customer. At the same time Jones sold certain stock he held for Galigher even though Galigher had not given Jones an order to sell. After determining that Jones was liable to Galigher for this wrongful conduct, the Court explored the question of appropriate damages. It began by setting forth the rule that

the measure of damages in stock transactions of this kind is the highest intermediate value reached by the stock between the time of the wrongful act complained of and a reasonable time thereafter, to be allowed to the party injured to place him-

self in the position he would have been in had not his rights been violated.

*Id.* at 200, 9 S.Ct. at 337.

As the Court in *Galigher* noted, the purpose of this rule is best exemplified in the case of a wrongful conversion of stock. Ordinarily goods have a fixed or relatively stable market value at which they can be replaced, so the measure of damages when such goods are converted is their value at the time of conversion or, in the case of a wrongful sale or purchase, at the time fixed for their delivery. But in the case of goods whose market value is volatile—stock, for example—to allow the injured party merely the value of the stock at the time of conversion would provide an inadequate and unjust remedy, because "[t]he real injury sustained by the principal consists . . . in the sale of [the stock] at an unfavorable time, and for an unfavorable price." *Id.* Thus, it is necessary when assessing damages in this kind of case to include profits possibly lost as a result of the wrongful conduct.

The *Galigher* Court discussed the issue of deciding what later value of converted or wrongfully-handled stock would be the correct measure to use in determining damages. It considered the old English rule that "the measure of damages [is] the value of the stock at its highest price on or before the day of trial." *Id.* at 201, 9 S.Ct. at 337. But the Court settled instead on the New York modification of this rule. This modification had been promulgated to alleviate the hardship occasioned by estimating damages at the highest intermediate value up to the time of trial, an event which might not take place until years after the transaction complained of. This modified rule states that the "true and just measure of damages in these cases" is "the highest intermediate value of the stock between the time of its conversion and a reasonable time after the owner has received notice of it to enable him to replace the stock." *Id.* *See also McKinley v. Williams,* 74 F. 94, 102–03 (8th Cir.1896).

In applying this rule the Court did not require that the injured party *actually* replace his stock in order to recover lost profit

damages. *See Letson v. Dean Witter Reynolds, Inc.,* 532 F.Supp. 500, 503 (N.D.Cal. 1982). The purpose of mentioning a reentry into the market was simply to establish the outer time limit of a reasonable period during which the highest intermediate value of the lost stock could be ascertained. *See id.* Just as it would be unjust to limit damages to the value of lost stock at the time of conversion, it would be similarly unjust to award as damages the highest value attained by the stock at a point in time well after an injured party who wanted to continue speculating in the market knew his shares were lost and could have replaced them.

■ Thus, what constitutes a reasonable period between the act complained of and the time when reentry into the market would be both warranted and possible will vary from case to case, but the injured party is not actually required to reenter the market in order to determine when he might have done so. Practical reasons dictate this. The value of lost securities may rise dramatically the day after a wrongful conversion and then embark on a prolonged downward spiral. Had the owner of such securities not been wrongfully parted with them, he might well have been prompted to sell them within a few days, as their value began to plummet. To require him actually to reenter the market and repurchase the same securities as a predicate for a damage claim, when steadily falling prices render such an investment imprudent, would frustrate the rule which seeks to make an investor whole. Rather than mitigating damages, as this example illustrates, a requirement that there be an actual repurchase could result in an *increase* in damages.

■ The old *Galigher* rule has been more precisely refined by this Circuit to eliminate a possible windfall for claimants. Such can occur when wrongfully converted property of fluctuating value reaches a higher price in the period between its conversion and the notice of conversion than in the period between notice of conversion and a reasonable time thereafter granted to a claimant to permit the reestablishment of his precon-

version position. In such cases the injured party should not be afforded the windfall of the higher price attained during the period before he receives notice of the conversion, because "if he had desired to dispose of [his property] in that interval, he would have learned of the conversion." *In re Salmon Weed & Co.,* 53 F.2d 335, 341 (2d Cir.1931) (per curiam) (on petition for re-hearing). A claimant will not be permitted to receive this higher value which "he has shown no desire to realize." *Id.* at 341–42. Thus, the measure of damages for wrongful conversion of stock is either (1) its value at the time of conversion or (2) its highest intermediate value between notice of the conversion and a reasonable time thereafter during which the stock could have been replaced had that been desired, whichever of (1) or (2) is higher. *See id.* at 342.

Many cases subsequent to *Galigher* have essentially followed its reasoning in measuring damages where stock or "properties of like character," *McKinley v. Williams,* 74 F. at 103, were converted, not delivered according to contractual or other legal obligation, or otherwise improperly manipulated. *See, e.g., Mitchell v. Texas Gulf Sulphur Co.,* 446 F.2d 90, 104–06 (10th Cir.) (where investors sold stock in reliance on misleading press release, measure of damages is highest price of stock during a reasonable period (between 9 and 17 days) after investors learned of wrong and should have reinvested had they desired to), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971); *Nephi Processing Plant v. Talbott,* 247 F.2d 771, 774 (10th Cir.1957) (turkeys sold at wrong time in breach of binding instructions to sell at a later date); *In re Schuyler, Chadwick & Burnham,* 63 F.2d 241, 242 (2d Cir.1933) (wrongful hypothecation of stock); *Clements v. Mueller,* 41 F.2d 41, 42 (9th Cir.1930) (breach of contract to sell stock); *Rivinus v. Langford,* 75 F. 959, 961 (2d Cir.1896) (conversion of a judgment whose value fluctuated according to debtor's changing financial status); *In re Swift,* 114 F. 947, 949 (D.Mass.1902) (broker's breach of contract to deliver stocks on demand). In two recent cases the properties of fluctuating value were commodities

futures contracts. *See Chipser v. Kohlmeyer & Co.,* 600 F.2d 1061, 1067–68 (5th Cir. 1979) (due to investor's desire not to reenter the market after his contracts were liquidated, damages were assessed as the difference between value at time of liquidation and value at time he decided to stay out of the market); *Letson v. Dean Witter Reynolds, Inc.,* 532 F.Supp. at 502.

Thus, we think it now well established that the *Galigher* rule, as refined by this Circuit's *Salmon Weed* case, states the proper standard to be applied in determining Schultz's reparation damages, if and when the Commission finds that respondents unlawfully liquidated his positions. This case is therefore remanded to the Commission for it first to make a finding as to respondents' liability and, if such liability is found, for it then to assess damages in accordance with this opinion.