**Shiv B. KATARA, as Administrator of Manisha Sportswear, Inc.'s Defined Pension Trust, Plaintiff,**

v.

**D.E. JONES COMMODITIES, INC. and Alpha O. Nickelberry, Defendants and Third-Party Plaintiffs,**

v.

**Shiv B. KATARA, in his individual capacity, Third-Party Defendant.**

No. 85 Civ. 4604 (KTD).

United States District Court, S.D. New York.

Dec. 9, 1986.

Baratta & Goldstein, New York City, for plaintiff and third-party defendant; Howard J. Goldstein, of counsel.

Cadwalader, Wickersham & Taft, New York City, for defendants and third-party plaintiffs; John J. Walsh, H. Peter Haveles, Leslie R. Caldwell, of counsel.

KEVIN THOMAS DUFFY, District Judge:

D.E. Jones Commodities, Inc. ("Jones") is made up of people who defraud their clients. The jury so found. Jones defrauded Shiv B. Katara, the plaintiff, here. The jury so found. Indeed, the jury found that in this case, Jones was guilty of a gross and wanton fraud evincing a "high degree of moral turpitude and absolutely wanton dishonesty." Tr. 401. The jury similarly held against the defendant Alpha O. Nickelberry. The jury made these findings in a relatively short period of deliberations because the evidence in this case compelled them.

By ignoring these findings and acting as if the defendant's case had been totally accepted by the jury, the defendants now move to set aside the verdict herein and to have the court enter a judgment n.o.v.

This case involves an old fashioned fraud committed by the defendants in the sale of commodity futures contracts. Jones is a commodity futures brokerage house or a futures commissioned merchant registered with the Commodities Futures Trading Commission ("CFTC") and located in New York City. At all relevant times, Alpha O. Nickelberry ("Nickelberry") was an account executive and manager at Jones and was registered with the CFTC as an associated person of Jones. At the time of trial the fast talking Nickelberry had no connection with Jones. Katara was the administrator of the Manisha Sportswear Defined Pension Trust Plan and a fiduciary as that term is defined in the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* (1979). *See* Findings of Fact in Consent Pretrial Order.

Apparently Jones solicited Katara on a number of occasions to open a commodities account with Jones. Finally, Katara drove two hours from the Manisha plant in New Jersey to the offices of Jones in New York. At the time, Katara had an account at Merrill Lynch, both in his own name and as administrator of the Manisha Sportswear Pension Trust. When Katara entered the Jones office he met a Mr. Rutherford who immediately took him to meet the defendant Alpha O. Nickelberry. A discussion ensued at which Nickelberry advised Katara that he could not as the administrator of the Pension Trust invest in gold or silver since that would be too speculative. Nickelberry suggested that because Katara was interested in stocks and bonds that he could purchase the Standard and Poors ("S & P") 500 Index. He explained to Katara that the S & P 500 Index futures contract was made up of composite stock prices.

Nickelberry also told Katara that normally they charged a $20 commission but said that he would try to have the commissions reduced to $17 for every round turn. In fact, a $20 commission was charged for every round turn.

The following day, Katara met with Nickelberry at the Jones office. Certain form agreements were given to Katara which he signed and at trial he testified that he believed Mr. Rutherford was there when the forms were signed.

Among the agreements which Katara signed in connection with the opening of the Manisha Sportswear account was a customer agreement. The customer agreement was prepared totally and completely by Jones, printed up and given to Katara to sign. That agreement stated among other things that "the undersigned acknowledges that Commodities Future Trading is speculative, involves a high degree of risk and is suitable for persons who can assume the risk of substantial losses." At some point, Katara also received Jones' Risk Disclosure Statement. That document was also a form prepared by and printed for Jones to give to its customers. The Risk Disclosure Statement contained a similar rubric concerning the risks of commodities trading.

Apparently, these statements did not bear much weight with the jury particularly in view of the fact that Katara and Nickelberry had discussed the possibility of trading conventional commodities such as gold and silver but that had been swept aside by Katara as being too speculative for the Pension Plan. It is clear that the S & P 500 Index futures contracts have absolutely nothing to do with ordinary commodities contracts or commodities futures contracts. Tr. 174. Indeed, since Katara testified that the gold and silver deals were out because they were too speculative, the jury could have concluded that the forms Katara signed were thought by him as a reasonable person to deal with general commodities and not with such noncommodity items as the S & P 500 Index futures contract. In any event the Risk Disclosure Statement somehow was dated four months after the opening of the account. Tr. 358.

Both the day before and during the meeting at which these form agreements were signed Katara also told Nickelberry that the fund of which he was trustee had $800,-000 to invest. He advised Nickelberry that the fund was in its first year and the $800,000 had been put into the fund as an initial down payment for prior service as required by some actuary. The form shows the $800,000 entry for both net worth and annual income. Neither Nickelberry, Rutherford nor anyone else at Jones ever asked to see the trust agreement under which Katara was operating until the account was closed. Nickelberry, Rutherford and Jones knew that the entire $800,-000 was not intended to go for S & P 500 Index futures contracts if not from common sense then from Katara's disclosure that the Manisha Defined Pension Trust had a stock investment account at Merrill Lynch.

Discussions were also had, apparently on both days concerning margins; Katara told both Nickelberry and Rutherford that he would not be able to trade if he had to pay an initial margin of $6,000 per contract. Tr. 54. Mr. Nickelberry assured Katara that if he had enough in the maintenance margins, the initial margin would not be charged by Jones. It appears that maintenance margin was explained to Katara as an amount put into the account from time to time to cover possible losses in the fluctuations of the market. Tr. 56. It is unclear as to the exact words spoken to Katara that day.

In any event, Katara entered an order for two S & P 500 Index futures contracts that day. He also deposited with Jones a $10,000 check which he claimed was intended for maintenance margin only. It cannot be disputed that if the two contracts were ordered at the same time and Jones was charging the plaintiff initial margin, the transaction could not be completed ($6,000 initial margin times 2 contracts equals $12,-000, $2,000 more than plaintiff admittedly paid in to the account that day).

From this alone the jury could reasonably have concluded that Katara was telling the truth when he testified that Jones and its representatives had agreed to waive initial margin on the Manisha account. The defendants contended that Katara did

not order the two contracts at one time but rather ordered one contract in the morning, hung around the Jones office all day and ordered the other contract in the latter part of the day. This testimony was palpably false. It seems silly to argue, as the defendants seemingly still do, that Katara, a busy importing executive with a place of business in New Jersey, two hours from Jones' office in Manhattan, spent long periods of time over many days hanging around the Jones' board room. It is even more incredible when Jones' counsel brought out that Katara had a machine at his place of business in New Jersey to get up to the minute quotes from the financial markets. The jury could easily have concluded from what appear to be deliberate falsehoods that the Jones' representatives were trying to "con" the jury the same way that Jones "conned" Katara.

The defendants raise another interesting argument which they apparently believe mandates a finding that Nickelberry and Jones never waived initial margin. The defendants assert that the waiver of initial margin would violate the rules of the Chicago Mercantile Exchange and possibly the Commodities Futures Trading Act and that therefore Nickelberry never said that there would be such a waiver. I have seen it argued that a violation of Exchange Rules does not give rise to a cause of action but this is the first time I have seen the chutzpah of the argument that a potential violation of such rules precludes good old fashioned fraud.

In passing I should note that I believe Nickelberry and Rutherford, acting for Jones, did violate such rules and did so wilfully, unlawfully, and intentionally. Indeed, Arnold Zisselman, the Comptroller and Vice-President of Jones and its margin expert, admitted to other Exchange Rules violations. Tr. 277.

In any event over the ensuing months, with one minor exception when the account was closed, the plaintiff bought and sold S & P 500 Index futures contracts apparently without any difficulties and apparently in accord with his version of the margin re-quirements given him by Jones. No new account papers were ever signed and it seems there was never any further discussion as to margin or to the way the account was to be handled.

By February 2, 1984 the Manisha account at Jones had thirty-five March, 1984 S & P 500 Index futures contracts. Tr. 207. Katara had deposited about $160,000 into the account to support the trading. Tr. 92–94, 207–8. About this time the market apparently turned against the plaintiff. On February 3, 1984, on recommendation of the defendants, Tr. 110, the plaintiff purchased twenty-five more S & P 500 Index futures contracts. Tr. 209. As of February 3, 1984, Jones considered the Manisha account undermargined and on February 6, 1984 actually put out a margin call to Katara for the Manisha account for $315,000. This amount was calculated by demanding a full $6,000 initial margin for each of the sixty accounts less an assigned value of $45,000 for the contracts and other assets in the account. Tr. 213. Katara was notified of a margin call by Arnold Zisselman and the plaintiff wired $150,000 to Jones. On that same date Jones also purchased another five contracts at Katara's request for the Manisha account. This was done although according to Zisselman the account was seriously undermargined. Another five contracts were purchased for the Manisha account on February 7, 1984 again when the account was even more seriously under margined. There is no indication that initial margins for these two purchases were ever charged at the time of the purchases. Tr. 130, 166.

On February 8, 1984, Zisselman called Katara and demanded an immediate initial margin on all seventy contracts in the account totaling $420,000. Katara complained that he had never been charged initial margin, that no initial margin was supposed to be charged in the account and Katara explained that he could not deliver $420,000 immediately to Jones. In reply, Zisselman told him that he would liquidate at least fifty contracts. On February 9, 1984, Katara directed Jones to liquidate the

remaining positions in the Manisha account and to close that account. Consent Pretrial Order, 4. Jones eventually sent a check or checks to Katara for the $120,000 liquidation value of the account.

This action thereafter ensued for the damages incurred because of the liquidation of the account. After the account was liquidated the market turned up and the jury found the damages actually done to the Manisha Pension Trust to be $296,125. The jury also awarded punitive damages in the amount of $150,000. Tr. 415.

Although there was little basis for the cross-claim by Jones and Nickelberry against Katara personally, and the cross-claim seemed abandoned in the defendants' summation, I let it go to the jury. The jury applied the law and its common sense to the evidence and found that "Katara is innocent of any wrongdoing...." Tr. 415.

■ The defendants now claim that they are entitled to a judgment n.o.v. because Katara's testimony must be viewed as "unsupported, self-serving testimony, which is insufficient even to withstand this motion", *citing Comfort v. Trane Air Conditioning Co.,* 592 F.2d 1373, 1383 (5th Cir.1979); Defendants' Memo, 10. The simple answer to this argument is that Katara's testimony was not unsupported. Indeed, the documents generated by the defendants support the testimony. This in itself completely blunts the rest of the defendants' argument.

■ However, the defendants also argue that fraud has not been proven. Ignoring the claim by defendants that the plaintiffs testimony cannot be considered in this connection, Defendants' Memo, 10, it is clear that all five elements were proven:

(1) The defendants are responsible for a *statement* that no initial margin was to be demanded or collected;

(2) That statement was clearly *false;*

(3) At the time the statement was made the *defendants knew* it was false;

(4) The plaintiff *relied upon* the representation that no initial margin was to be collected. If he had not he would neither have opened the account nor traded as heavily as he did. With a fund of $800,000 it is unreasonable to think the plaintiff would have undertaken positions that would call for an initial margin (that could be demanded at any time) of $420,000; and

(5) Clearly the plaintiff suffered *damage* as a direct result of the false statements.

The same analysis would apply to the false statements of the defendants that S & P 500 Index futures contracts were "safe".

■ The defendants also argue that the court was prejudiced against them and prevented them from getting a fair trial. This argument is totally specious and built solely on distortions of the record.

To show the lengths to which counsel for the defendants have gone in practicing their deceit, it is necessary only to point to the affidavit of Earl H. Nemser, Esq. submitted as part of the moving papers on this motion. In his affidavit, Mr. Nemser purports to describe an off-the-record conversation had with the court. To make his description of that off-the-record conversation part of the record, the affidavit contains the following paragraph:

2. Prior to the end of my opening statement to the jury, the Court terminated my remarks and directed me to sit down. Thereafter, in Chambers and off-the-record I respectfully asked the Court for permission to complete my opening statement. This request was denied.

Nemser Affidavit ¶ 2.

The rest of the affidavit goes on to say what would have happened if Mr. Nemser had been permitted to complete his opening statement. The affidavit is totally and completely misleading. It fails to mention that in his opening statement, Earl Nemser decided to advise the jury, "I think the judge made an error in describing margin." Tr. 40. Nemser made these comments to the jury after I had advised them that I would describe the technical words to them and I had given an example of margin to them. Tr. 15, 16. Mr. Nemser, when

asked if he had taken any exceptions to the court's instructions including that on margins, said "No, your Honor." Tr. 17. Mr. Nemser does not argue that his suggestion to the jury that the court was in error was not sufficient grounds to stop the opening statement. Rather, he ignores the reason for the interruption of the opening statement and makes it appear as if he was denied a chance to continue his opening statement purely out of personal pique.

■ Similarly, his recitation of the off-the-record conversation is totally and completely misleading.

The conversation alluded to by Mr. Nemser was off-the-record at the specific request of Mr. Nemser, Tr. 42, because Mr. Nemser represented that he had personal and private matters to share with the court. After this start, Mr. Nemser stated that he was under great pressure and he apologized for his statements and for his condition. He did ask for permission to finish his opening statement and stated that he was almost finished with it. At first, I started to say that he had not done so well by publicly insulting the court, but when he became physically agitated, I suggested that it may be better if he did not attempt to finish the opening. I did so out of a real concern for his physical and psychological well being. It would appear that my concern was well placed because part way through the trial Mr. Nemser was caught misrepresenting the facts to the court and jury when he read a small part of a deposition answer in a vain attempt to show an inconsistency in the witness' testimony. Tr. 98. Somehow the defendants now argue that admonishing counsel for this lack of honesty was improper. Defendants' Memo, 26 n. 4. Thereafter, he, in effect, almost retired from the litigation of the case leaving an associate (obviously a tyro) to present the rest of the clients' case and to read a summation at, rather than to, the jury. Nemser was present throughout this and indeed, handled the exceptions to the court's charge. *See, e.g.,* Tr. 406. The day after the court's charge when the jury

returned a verdict, Mr. Haveles, apparently Mr. Nemser's partner, was on hand for an obviously confused Earl Nemser. Tr. 416. It should be noted that Earl Nemser's name does *not* appear on the papers for this motion other than as affiant.

■ The defendants complain that the court made prejudicial comments and list nine instances in the record where this supposedly occurred. The first two listings are pages 155–57 and 173–74. Defendants' Memo, 31. These pages are copied in full in the margin.[1] The first page complained of, page 155, shows the court saying two words—"Sustained" twice. These "prejudicial comments" were proper rulings, and made after objection excluding clearly hearsay items. These were prejudicial only in the sense that the defense team was not permitted to get inadmissable evidence before the jury. On page 156 the same thing occurs at lines 12 and 13. At line 17 Ms. Caldwell for the defense finished her direct examination. Thereafter, on pages 156 and 157 the court cleaned up some obvious misstatements by the defendant Nickelberry who was on the witness stand. Nickelberry stated on direct examination he had met Katara in June or July, 1983, but the court pointed out that the original purchase and sale statements are dated May, thus prompting the witness to correct his testimony. Tr. 156, line 19; Tr. 157, line 4. The defendants allege that this "distorted" the evidence. If anyone is guilty of distortion, I submit that it is not the court.

■ The defendants also complain about my remarks outside the presence of the jury which supposedly intimidated the defendants' witnesses. Defendants' Memo, 31, n.; 32, n7. For example, I suggested that recommending S & P 500 Index futures contracts as a "hedge" for the Manisha fund was like suggesting Lotto as a hedge in the circumstances. Tr. 133. The witnesses testified under oath that each would tell the "truth, the whole truth...." There is no indication in the defendants' papers or in the record of me ever stopping

1. See attached Transcript pages 155–57 and 173–74.

any witness from answering a proper question. Perhaps the defendants are disappointed because the witnesses did not give the pat answers that counsel prepared them to give. Or is it that the defendants want to suggest that their own witnesses violated the oath by failing to tell the "truth" or the "whole truth"? Obviously, the jury found, and rightly so, that the defense witnesses did not tell the truth or the whole truth and that is what defendants really object to.

The defendants' complaints about the charge are made up of the same type of misstatements and distortions as are their other arguments. For example, the defendants find fault with the statement in the charge:

> Now the reason I took judicial notice of the various prices up to [sic] the end [expiration of March '84 S & P's] was to give you a basis as to what the highest prices of the identical contracts were.

Defendants' Memo, 36. This sentence is taken entirely out of context. The entire section of the charge was

> Now, the appropriate measure of damages in the case of a wrongful liquidation is the difference between the liquidation price of the contract and the highest intermediate price reached by the identical contracts during a reasonable period after the wrongful sale. Now, the reason I took judicial notice of the various prices up until the end was to give you a basis as to what the highest prices of the identical contracts were. It's up to you to determine, however, what a reasonable time is, in the case of the plaintiff, to reenter the market after a wrongful liquidation.

Tr. 398–99.

■ The basic complaint to this charge at the time of trial was that I had not instructed the jury that a "reasonable time" was two days as a matter of law.

The defendants continue to make that argument and try to base it on *Cauble v. Mabon Nugent & Co.*, 594 F.Supp. 985, 996 (S.D.N.Y.1984). Somehow the defendants would have this court remove a question of fact, that is, what is a reasonable time, from the jury based on a case where the court found there was no question of fact. *Cauble*, 594 F.Supp. at 996.

The defendants now suggest that even if reasonable time was a question of fact, it is unreasonable to permit it to be more than five days in view of the fact that the market is volatile. The fact that the market was volatile was something well known to the defendants at the time the account was liquidated. They should not be permitted to pay less than full damages just because the market was volatile. The measure of damages given to the jury was that approved by the Second Circuit in *Schultz. v. Commodity Futures Trading Commission*, 716 F.2d 136, 140–41 (2d Cir.1983).[2]

■ The defendants also claim that the charge on contract law was incorrect. I am not quite sure what argument is being made. Perhaps the defendants believe that I should not have permitted the jury to consider whether the contract was incomplete because the contract provides that it cannot be varied except in writing. But it appears clear that the customer agreement was not complete on its face. Paragraph six provides "The undersigned will at all times maintain and keep its accounts fully margined, as to both original and maintenance margin, in accordance with your requirements as from time to time are in effect. Such margin requirements established by you in your sole and absolute discretion may exceed the margins set by any exchange or clearinghouse." Tr. 268–9. Whatever margin rules that were set up by Jones were never published and sent to the customers. Tr. 269. The customer could not figure out margin with the infor-

---

2. The court in *Schultz* held that the measure of damages for wrongful conversion of stock is either (1) its value at the time of conversion or (2) its highest intermediate value between notice of the conversion and a reasonable time thereafter during which the stock could have been replaced had that been desired, whichever of (1) or (2) is higher. 716 F.2d at 141.

mation given in the confirmations, monthly statements, Tr. 269–70, and the sheets showing the amounts of margin calls were never sent to the customers. Tr. 270.

In effect, the defendants argue that a contract is complete and unambiguous when one side can, in secret, change its terms whenever it wants to. I believe that such a contract is incomplete and, indeed, may well lack mutuality.

■ The defendants also seek at least a remittitur of the punitive damages. There is no suggestion by Cadwalader, Wickersham and Taft that punitive damages are not appropriate in cases involving fraud in the sale of commodities and S & P 500 Index futures contracts. *Cf. Aldrich v. Thompson McKinnon Securities, Inc.,* 756 F.2d 243 (2d Cir.1985). Obviously if punitive damages are appropriate in securities cases they are appropriate in commodities cases.

There is no suggestion that the instructions to the jury concerning punitive damages were improper or that the jury did not follow those instructions.

■ Instead the defendants argue that Jones cannot be liable for Nickelberry's fraudulent statements to Katara, Defendants' Memo, 21, and Nickelberry cannot be liable for the liquidation of plaintiffs' account since at that time Nickelberry was in the hospital and had nothing to do with the liquidation. This ignores the whole concept of agency. Nickelberry was an employee of Jones, acting for Jones at the time he made the statement. What more can be required? Moreover, Nickelberry was in constant telephone communication from the hospital with Zisselman about the liquidation.

The other arguments raised by the defendants are similarly without merit.

The motion is denied.

SO ORDERED.

Nickelberry—direct

THE COURT: Sustained.

Q. Mr. Nickelberry, you said that—previously you said that you executed 20 additional contracts approximately for Mr. Katara after your conversation in January of '84, correct?

A. That's correct.

Q. Did you execute any contracts for him after those 20?

A. I may have executed four or five or that additional five that had been discussed. I may have done that. I am not quite sure. I went into the hospital the 6th of February.

Q. When did you go into the hospital?

A. The 6th of February, the testing, and I was admitted the 8th of February. I was still in touch with Arnold Zisselman at least once or twice a day.

Q. What did you discuss with Arnold Zisselman?

MR. GOLDSTEIN: Objection.

THE COURT: Sustained.

Q. How long were you in the hospital, Mr. Nickelberry?

A. I was in the hospital from February 8 until February 17.

Q. When you came out of the hospital, did there come a time when you learned that the Manisha Trust account positions had been sold?

A. I was aware that the contracts had been sold the day before my surgery. There was a big problem and I was being prepared for surgery but we had to deal with the problem.

Q. Who informed you that the accounts were being sold?

A. I had a conversation with Arnold and he then told me we would have no choice but to liquidate the position.

Q. Did he explain why?

MR. GOLDSTEIN: Objection.

THE COURT: Sustained.

Q. Mr. Nickelberry, did you have any conversations with Mr. Katara after the positions had been sold?

A. No.

MS. CALDWELL: I have no further questions, your Honor.

THE COURT: I think maybe I should clean up one thing. You indicated that you met Mr. Katara in June or July 1983. If I tell you that the first P & S statement is dated sometime in May 1983, would you change that?

THE WITNESS: Yes.

THE COURT: You were on this account from the very beginning?

Nickelberry—cross

THE WITNESS: That's correct.

THE COURT: Very, very beginning?

THE WITNESS: That's correct. It could have been May.

THE COURT: In May 1983 you had the same rules from the exchange, right, $6,000?

THE WITNESS: That's correct.

THE COURT: Per contract?

THE WITNESS: That's correct.

THE COURT: And if you didn't have the $6,000 then you would be in violation of the initial margin, right?

THE WITNESS: That's correct.

THE COURT: Would you take a look at the first two statements that were sent out.

THE WITNESS: I am sure I did. I looked at every statement.

THE COURT: The first statement shows that there are two checks for $10,000 going in and the purchase of two contracts. The second statement shows that one of those checks is returned. So you only have $10,000, two contracts. Two into ten goes five, the last time I checked. You only had $5,000 per contract; is that correct?

THE WITNESS: That's correct, if one was returned.

THE COURT: Take a look at it and see if I am

Zisselman—direct

A. As controller my duties were to monitor mostly the financial aspects of the company, to insure that we were in compliance with all the rules and regulations of the various governing agencies. After I became vice-president my duties then somewhat overlapped into other areas of compliance, customer accounts, margin requirements, et cetera, et cetera.

Q. That was after you became vice-president?

A. Yes.

Q. When you say compliance does that include compliance with exchange regulations as well as other governmental regulations?

A. Yes.

Q. Mr. Zisselman, what is your understanding of the terms futures contract; what is a futures contract?

A. A futures contract is an agreement between a buyer and a seller to deliver or have—to deliver to or have delivered a fixed commodity at sometime in the future. Commodities can be either things like gold or silver or soy beans or pork bellies or lumber. They could also be financial futures, like treasury bonds, treasury bills. They can also be stock indexes as in the case of Standard & Poors index futures.

THE COURT: What is to be delivered?

THE WITNESS: The actual goods or services are

to be delivered.

THE COURT: You are talking about a Standard & Poors index.

THE WITNESS: Yes.

THE COURT: What is to be delivered, the average?

THE WITNESS: No. A Standard & Poors contract—

THE COURT: 100 shares of everything?

THE WITNESS: No, your Honor. In the case of indexes there's no actual deliv-

ery, it's a cash settlement when the contract expires.

THE COURT: So then your definition of a commodity does not fit into this—

THE WITNESS: No, that is—

THE COURT: What's to be delivered? You say nothing. We are going to give him money. That is not bad. I like people to deliver money too. It's not a commodity.

THE WITNESS: Yes, it is. Certain commodity contracts are deliverable as particular commodities. Other commodity contracts are deliverable—are settled in cash. The Standard & Poors index is one of those contracts.

Q. Is the Standard & Poors stock index futures contracts were they traded on a commodity exchange?

A. Yes, they are. All commodity contracts must be traded on a registered commodity exchange.

Q. Which one are the Standard & Poors, which I am