Shiv B. KATARA, as Administrator of Manisha Sportswear, Inc. Defined Pension Trust, Plaintiff-Appellee,

v.

D.E. JONES COMMODITIES, INC., and Alpha O. Nickelberry, Defendants–Appellants.

No. 1046, Docket 87–7027.

United States Court of Appeals, Second Circuit.

Argued April 22, 1987.

Decided Dec. 14, 1987.

Howard Goldstein, New York City (Baratta & Goldstein, New York City, Linda Mary Anov, of counsel), for plaintiff-appellee.

John J. Walsh, New York City (Cadwalader, Wickersham & Taft, New York City, H. Peter Haveles, Jr., Leslie R. Caldwell, of counsel), for defendants-appellants.

Before KAUFMAN, MESKILL and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge.

This appeal is taken from a judgment entered upon a jury verdict in the United States District Court for the Southern District of New York, Kevin T. Duffy, *Judge,* awarding $296,195 in compensatory damages and $150,000 in punitive damages to plaintiff in a diversity case based upon common law fraud and breach of contract and dismissing defendants' counterclaims and third party claims against plaintiff, and from an order denying defendants' motion for judgment notwithstanding the verdict or for a new trial. We affirm in part, reverse in part, and reverse and remand in part.

### Background

On May 11, 1983, Shiv B. Katara came to the offices of D.E. Jones Commodities, Inc. ("Jones") to discuss opening an account.

Katara apparently had been heavily recruited by Jones personnel. He returned the next day and opened an account for the Manisha Sportswear, Inc. Defined Pension Trust (the "Trust"), of which he was administrator.

Katara opened the account to allow him to trade Standard & Poor's 500 Index Futures Contracts. Each such contract (an "S & P") is a "bet" on the future of the Standard & Poor's 500 composite stock price index, which is based upon the market value of the common stock of 500 different companies. Chicago Mercantile Exchange, *S & P 500,* at 4 (1986). S & P's are traded on the Chicago Mercantile Exchange (the "Exchange"). In theory, one who sells an S & P undertakes to deliver, and one who buys to accept delivery of, a portfolio of stocks represented by the Standard & Poor's 500 Index at a specified date for a specified price. Delivery, however, takes the form of a cash settlement of the difference between the original transaction price and the final price of the index at the termination of the contract. A "long" position holder, who has bought an S & P, profits from a rising futures price and contract value. *Id.* at 6. The value of an S & P is determined by multiplying the futures price by $500 (*e.g.,* a contract with a price of 185.50 would have a value of $492,750). *Id.* at 5. A trader can use a position in S & P's to hedge his position in the stock market or for speculation. *See* N. Dunnan, *Dun & Bradstreet's Guide to Your Investments: 1986,* at 183, 186–88 (1986); *The Almanac of Investments* 423, 425 (A. Crittendan ed. 1984).

Persons investing in S & P's are required to have cash or equivalent "margin" in their accounts as a guarantee of fulfillment of the contract. The initial margin required for each S & P is $6,000, a minimum amount set by the Exchange. Thereafter, if the market moves in the direction unfavorable to the investor's position, so that his equity falls to or below $2,500 (as a result, for example, of a decline in the market reducing the value of the "long"

position of a purchaser of an S & P),[1] a level denominated as maintenance margin, a deposit of cash or its equivalent must be made to restore the position to the level of original margin, $6,000. The process of notifying the customer to make the required additional deposit is a "margin call."

Under Jones' practice at all relevant times, if the value of an account fell below the maintenance margin, the customer was required to increase the value of the account to the initial margin. Katara claims, however, that he was told by his account manager, Alpha O. Nickelberry, that he would not have to meet initial margin requirements if his account fell below the maintenance margin.

When Katara opened his account with Jones, he signed a Customer's Agreement on May 12, 1983 which provided that margins must be maintained, authorized Jones to liquidate the customer's positions under stipulated circumstances, and gave notice of the risk involved in commodities trading. The agreement, signed by Katara for the Trust, provided in relevant part ("you" or "your" refers to Jones; "the undersigned" refers to Katara):

1. The undersigned acknowledges that commodity futures trading is speculative, involves a high degree of risk and is suitable only for persons who can assume the risk of substantial losses. The undersigned understands that because of the low margin normally required, commodity futures trading may result in losses substantially in excess of funds on deposit.

    •    •    •    •    •

6. The undersigned will at all times maintain and keep its accounts fully margined (as to both original and maintenance margin) in accordance with your requirements as from time to time are in effect. Such margin requirements established by you, in your sole and absolute discretion, may exceed the margin set by any Exchange or Clearing House.

7. Whenever the undersigned has failed to make any payment to you when due, or has failed to maintain and keep its accounts with you fully margined, or at such other time as you, in your sole and complete discretion, deem it necessary or advisable for your protection, you are authorized in your sole discretion to cover any short position or liquidate any long position the undersigned may have with you through purchase or sale on any Exchange, and/or to sell as best you deem appropriate any collateral deposited by the undersigned with you, whether or not the undersigned received notice of your intention to effect either or both of the foregoing....

    •    •    •    •    •

20. This Agreement is not subject to oral modifications and the execution hereof revokes any and all other agreements made with you by the undersigned.

Thereafter, on September 12, 1983, Katara signed a Risk Disclosure Statement which provided in relevant part:

The risk of loss in trading commodity futures contracts can be substantial. You should therefore carefully consider whether such trading is suitable for you in light of your financial condition. In considering whether to trade, you should be aware of the following:

(1) You may sustain a total loss of the initial margin funds and any additional funds that you deposit with your broker to establish or maintain a position in the commodity futures market. If the market moves against your position, you may be called upon by your broker to deposit a substantial amount of additional margin funds, on short notice, in order to maintain your position. If you do not provide the required funds within the prescribed time, your position may be liquidated at a loss, and you will be liable for any resulting deficit in your account.

(2) Under certain market conditions, you may find it difficult or impossible to

---

**1.** This determination is made by comparing the amount of cash or securities in the account (as the result of supplying initial margin), plus the current value of the S & P, with the obligation of the investor at settlement of the S & P.

liquidate a position. This can occur, for example, when the market makes a "limit move."

(3) Placing contingent orders such as "stop loss" or "stop limit" order [sic] will not necessarily limit your losses to the intended amounts, since market conditions may make it impossible to execute such orders.

(4) A "spread" position may not be less risky than a simple "long" or "short" position.

(5) The high degree of leverage that is often obtainable in futures trading because of the small margin requirements can work against you as well as for you. The use of leverage can lead to large losses as well as gains.

This brief statement cannot, of course, disclose all the risks and other significant aspects of the commodity markets. You should therefore carefully study futures trading before you trade.

IN OPENING A COMMODITY FUTURES ACCOUNT WITH D.E. JONES COMMODITIES, INC., AS THE BENEFICIAL HOLDER OF INTEREST IN THIS ACCOUNT (OR, AS AN AUTHORIZED REPRESENTATIVE OF A BUSINESS ENTITY WHICH IS THE BENEFICIAL HOLDER OF INTEREST THEREIN), ACKNOWLEDGE [sic] THAT I HAVE RECEIVED AND UNDERSTAND THE RISK DISCLOSURE STATEMENT.

*See* 17 C.F.R. § 1.55 (1987) (requiring that risk disclosure statement be provided to customer opening a commodity futures account).

Early in February, 1984, Katara's "long" position in the S & P market went sour. The market in S & P's fell, and D.E. Jones made several margin calls on Katara's account. Katara failed to meet the full amount called, and the value of his account continued to drop. Throughout this period, Katara was dealing with Arnold Zisselman, a vice president of Jones, because Nickelberry, Katara's regular account manager,

was in the hospital. Finally on February 8, 1984, Zisselman liquidated fifty of the seventy S & P's in Katara's account, and liquidated the other twenty accounts the next day on Katara's instructions. At some point in this ongoing dialogue, Katara allegedly contended that he had an agreement with Jones that the Trust was not required to meet initial margin requirements. Katara did not thereafter, between the date of liquidation and the date of maturity of the S & P's that had been liquidated (approximately five weeks later), reenter the market by purchasing S & P's in order to mitigate the Trust's damages.

Katara brought suit to recover the Trust's damages, alleging common law fraud and breach of contract.[2] Defendants asserted both counterclaims and third party claims against Katara for indemnification, attorneys' fees and exemplary damages. After trial, the jury returned a verdict awarding plaintiff $296,195 in compensatory damages and $150,000 in punitive damages against both defendants, and dismissing defendants' claims against Katara. Judgment was entered thereon, and defendants moved for judgment notwithstanding the verdict or a new trial. The motion was denied, 652 F.Supp. 907 (S.D.N.Y.1986), and this appeal from the judgment and the denial of defendants' post-trial motions followed.

The parties have assumed, and we concur, that New York law governs this diversity action.

### Discussion

#### A. *Standard of Review as to Liability*

Jones moved in the district court both for judgment notwithstanding the verdict and for a new trial, as provided by Fed.R.Civ.P. 50(b). Both motions were denied. For the reasons hereinafter stated, however, the judgment for plaintiff must be reversed. The question thus arises whether judgment

---

**2.** Katara also asserted a claim based on Jones' alleged "violation of the applicable rules and regulations with respect to the suitability of investments and which were promulaged [sic]

to protect investors such as plaintiff." Complaint ¶ 49. Judge Duffy did not allow this claim to go to the jury, and plaintiff has not appealed from that ruling.

should be entered for defendant, or the case should be remanded for a new trial.

We have stated the standards for granting judgment n.o.v. in *Mattivi v. South African Marine Corp., "Huguenot"*, 618 F.2d 163 (2d Cir.1980):

> [T]he trial court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury. Rather, after viewing the evidence in a light most favorable to the non-moving party (giving the non-movant the benefit of all reasonable inferences), the trial court should grant a judgment n.o.v. only when (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.

*Id.* at 167–68; *see also Mallis v. Bankers Trust Co.*, 717 F.2d 683, 688–89 (2d Cir. 1983); *Michelman v. Clark–Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1042 (2d Cir.), *cert. denied*, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976); *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970). Although *Mattivi* stated the rule for a trial court to which a motion for judgment n.o.v. is addressed, the same standard applies on appellate review. *Howe v. Great Lakes Press Corp.*, 679 F.2d 1023, 1030 (2d Cir.), *cert. denied*, 459 U.S. 1038, 103 S.Ct. 452, 74 L.Ed.2d 605 (1982); *Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737, 742 (2d Cir.1975), *cert denied*, 424 U.S. 955, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976).

A less stringent standard applies to a motion for a new trial. A trial court should grant such a motion when convinced that the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice. *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 132 (2d Cir. 1986); *Mallis*, 717 F.2d at 691; *Benevino v.*

*Saydjari*, 574 F.2d 676, 684 (2d Cir.1978). On appeal, however, a trial court's denial of a motion for a new trial will be reversed only for clear abuse of discretion. *Newmont Mines*, 784 F.2d at 133, and cases there cited. Further, to the extent that a new trial is sought on the ground that a jury verdict was against the weight of the evidence, we have disclaimed the authority to review a ruling on such a motion. *Id.*, and cases there cited.

With respect to Katara's fraud claims, finally, the standard is shifted somewhat in favor of defendants' challenge to the verdict, due to the higher standard of proof (clear and convincing evidence, as hereinafter specified) required in fraud cases. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, ——, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Ajax Hardware Mfg. Corp. v. Industrial Plants Corp.*, 569 F.2d 181, 186 (2d Cir.1977).

Applying these standards, we conclude that Katara's fraud claim based upon a theory that Jones had represented S & P's to Katara as safe, and that Katara had relied on that representation, fails to satisfy this higher standard. Therefore, judgment for Jones must be entered thereon at this juncture. The judgment on Katara's fraud and breach of contract claims relating to a representation (fraud) or agreement (contract) concerning the waiver of initial margin requirements, on the other hand, is reversed and remanded for a new trial.[3] As to defendant Nickelberry, however, because he acted as an agent on behalf of a disclosed principal, only the fraud claim may be pursued against him.

### B. *Fraud*

The jury was presented with two fraud claims based upon two different alleged representations by Jones: first, that S & P's were safe investments; and second, that the requirement to restore initial margin would not be enforced. The elements of common law fraud are a material, false representation, an intent to defraud

---

**3.** As is made clear hereinafter as 971, we reach this result because a general verdict was rendered for plaintiff, which is necessarily infected by the possibility that the verdict was premised upon the wholly unsupported ground of a false representation as to safety.

thereby, and reasonable reliance on the representation, causing damage to the plaintiff. *Van Alen v. Dominick & Dominick, Inc.*, 441 F.Supp. 389, 403 (S.D.N.Y.1976), *aff'd*, 560 F.2d 547 (2d Cir.1977). Each element must be established by clear and convincing evidence. *Ajax Hardware*, 569 F.2d at 186; *Van Alen*, 441 F.Supp. at 403.

■ The determination of liability on the "safety" claim clearly cannot stand. Judge Duffy charged the jury that Katara had presented a theory of fraud based on Jones' representation "that the S & P's were a safe investment for the pension fund." However, Katara simply failed to present enough evidence on the safety issue to pass muster under the clear and convincing standard. Katara's best testimony on this issue was that S & P's were "suitable" for the pension fund, but Judge Duffy did not allow the suitability claim to go to the jury. In any event, any likelihood that Katara relied upon a representation as to "safety" is belied by his testimony that he was familiar with the risks involved in S & P investments, and nonetheless "went for profit":

> Q....
>
> Do you know how much of a loss would be taken on one Standard & Poors 500's futures contract if the price of the contract dropped one full point?
>
> A. $500 per contract.
>
> Q. And if there were 70 contracts and the market value of a Standard & Poors 500 futures contract dropped one point, how much of a loss would there be?
>
> A. It would be $35,000.
>
> Q. Did you know that before you bought any Standard & Poors 500 contracts as administrator for the trust through Jones?
>
> A. *Yes, I know what it would take to—it could be both ways. If there was a loss. I went for profit. I didn't go for losses.*
>
> Q. *You knew that the drop of one full point per contract would be a loss of $500?*
>
> A. *That's true.*
>
> Q. *Before you started trading as administrator for the trust?*
>
> A. *I am sure I did.*

A. 164–65 (emphasis added).

■ Katara's second fraud claim was that Jones falsely represented that Katara would not be required to restore initial margin ($6,000) if his position fell below the maintenance margin level ($2,500). Jones contends, however, that Katara complied seven different times with margin calls that brought the Trust's account up to or above initial margin levels when there was a maintenance margin deficiency, and Katara's counsel conceded the point at oral argument. Katara testified, on the other hand, that initial margin had never been demanded prior to February, 1984, which arguably raises a question whether he was aware of the effect of the prior margin calls. Furthermore, while the Customer Agreement authorized Jones to tape conversations with the customer, no tapes were introduced by Jones to show that its representatives did not waive the restoration of initial margin.

Under the standards previously discussed, we cannot say that there was such a complete absence of evidence in support of Katara's case on this claim, or such overwhelming evidence in opposition to it, that judgment should have been rendered for Jones thereon despite the jury's verdict. On the other hand, the judgment based on the jury verdict must in any event be reversed for an entirely different reason.

■ The jury returned a general verdict, which means that its verdict might have been premised upon a finding of a false representation (and reliance) as to safety, margin requirements, or both, or upon a breach of an oral contract. Since there was no basis for a verdict based upon a misrepresentation as to safety, the judgment based on that general verdict cannot stand. *Bone v. Refco, Inc.*, 774 F.2d 235, 242–43 (8th Cir.1985); *Morrissey v. National Maritime Union*, 544 F.2d 19, 26–27 (2d Cir.1976).

## C. Breach of Contract

For the reasons just stated, the general verdict and resulting judgment below could

not be affirmed even if we were to conclude that a breach of contract was adequately proved. The claim here is that the written contract represented by the Customer's Agreement and Risk Disclosure Statement was orally modified by an agreement between the parties that the Trust would not be required to restore original margin.

We note that this claim in many respects parallels the fraud claim as to which plaintiff will be accorded a new trial. We further note the conclusion of the district court that paragraph 6 of the Customer's Agreement, obliging plaintiff "at all times [to] maintain and keep its accounts fully margined (as to both original and maintenance margin)" in accordance with Jones requirements, could be varied by parol evidence. *See* 652 F.Supp. at 914–15. Section 20 of that agreement, however, is at least *prima facie* in accord with N.Y. General Obligations Law § 15–301(1) (McKinney 1978), precluding such variance. On the other hand, there are numerous exceptions to that rule, especially where, as here, the asserted oral modification is also alleged to constitute a fraudulent misrepresentation. *See Centronics Fin. Corp. v. El Conquistador Hotel Corp.*, 573 F.2d 779, 782 (2d Cir.1978). This issue will undoubtedly be developed further upon remand.

█ Finally, we note that judgment was rendered not only against Jones, but also against its employee Nickelberry. "It is well settled that when an agent acts on behalf of a disclosed principal *on a contract*, the agent will not be personally bound unless there is clear and explicit evidence of the agent's intention to be so bound." *Spain v. Howard Holmes, Inc.*, 108 A.D.2d 741, 742–43, 485 N.Y.S.2d 87, 89 (2d Dep't 1985) (emphasis added). Applying this rule to the evidence presented below, we see no basis for the contract claim against Nickelberry, and will therefore direct the entry of judgment notwithstanding the verdict as to that claim. The rule is different, however, with regard to the tort claim of fraudulent misrepresentation, as to which plaintiff may have a new trial against Nickelberry as well as Jones. *See*

*A & M Records, Inc. v. M.V.C. Distrib. Corp.*, 574 F.2d 312, 315 (6th Cir.1978) (corporate officer personally liable for torts committed by him even though acting for corporation); *Powe v. Miles*, 407 F.2d 73, 82 (2d Cir.1968) (agent responsible for own torts); *R.L. Rothstein Corp. v. Kerr Steamship Co.*, 21 A.D.2d 463, 469, 251 N.Y.S.2d 81, 86 (1st Dep't 1964) (same), *aff'd*, 15 N.Y.2d 897, 258 N.Y.S.2d 427, 206 N.E.2d 360 (1965); *Restatement (Second) of Agency* § 343 (1958) (same).

### D. *Damages*

Since error also occurred below with respect to damages, it is appropriate to address this question in remanding for a new trial of certain of plaintiff's claims.

Where a customer's position is involuntarily liquidated because of his failure to meet a margin call, application of the general duty to mitigate damages limits recovery to:

> the additional amount required to repurchase the same contracts in the market within a reasonable time after liquidation.... That amount is measured by the difference between the contracts' liquidation prices and the highest intermediate prices reached by the identical contracts during a reasonable period after the wrongful sale.

*Letson v. Dean Witter Reynolds, Inc.*, 532 F.Supp. 500, 503 (N.D.Cal.1982), *aff'd sub nom. Shearson Loeb Rhoades, Inc. v. Bryant*, 730 F.2d 769 (9th Cir.1984) (mem.). *See also Schultz v. Commodity Futures Trading Comm'n*, 716 F.2d 136, 139–41 (2d Cir.1983). This duty to mitigate applies where it is claimed that the involuntary liquidation was fraudulent. *Cauble v. Mabon Nugent & Co.*, 594 F.Supp. 985, 996 (S.D.N.Y.1984). *See also Schultz v. Commodity Futures Trading Comm'n*, 716 F.2d at 141.

█ Consistent with this rule, the district court properly instructed the jury that "the appropriate measure of damages in the case of a wrongful liquidation is the difference between the liquidation price of the contract and the highest intermediate price reached by the identical contracts

during a reasonable period after the wrongful sale." It is impossible, however, to reconcile the jury's verdict as to compensatory damages, upon which judgment was entered, with this instruction.

█ As appellants correctly contend in their main brief, p. 38 and n. 20, the maximum compensatory damages that the jury could have found, applying the difference between the liquidation price and the highest price reached during the remaining life of the March 1984 S & P's that were liquidated, was $83,000.[4] The jury delivered a "jury verdict note" which set forth their computation of compensatory damages and convincingly demonstrated their confusion concerning this subject. Whether or not we may properly take account of that note, *cf.* Fed.R.Evid. 606(b) (restricting inquiry as to validity of the jury verdict); *Libertelli v. Hoffman–La Roche, Inc.,* 565 F.Supp. 234, 237–38 (S.D.N.Y.1983) (applying Rule 606(b)), it is clear that a jury verdict which is inconsistent with the court's instructions as to the law is improper and must be set aside. *See Hoefferle Truck Sales, Inc. v. Divco–Wayne Corp.,* 523 F.2d 543, 551–52 (7th Cir.1975).

Appellants further contend that the "reasonable time" within which a customer may reenter the market is, at a maximum, five days, citing *Cauble v. Mabon Nugent & Co.,* 594 F.Supp. 985, 996 (S.D.N.Y.1984); *Letson v. Dean Witter Reynolds Inc.,* 532 F.Supp. at 507; *Stiller v. Shearson Loeb Rhoades, Inc.,* [1982–1984 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,974 (C.F.T.C. Jan. 4, 1984); *Blanding v. First Commodity Corp.,* [1982–1984 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,648 (C.F.T.C. Nov. 29, 1982); *Moore v. Cayman Associates, Ltd.,* [1980–1982 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,259 (C.F.T.C. Sept. 24, 1981); *Clampitt v. E.F. Hutton & Co.,* [1980–1982 Transfer Binder] Comm. Fut.L.Rep. (CCH) ¶ 21,120 (C.F.T.C. Sept. 19, 1980); *Havlik v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* [1977–1980 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,544 (C.F.T.C. Jan. 11 1978); and *Tavani v. Stotler & Co.,* [1977–1980 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,453 (C.F.T.C. Aug. 2, 1977).

We decline at this juncture to provide a hard and fast rule on this question, since the appropriate time period varies somewhat with the facts of the case. On the other hand, in light of the pertinent authorities and precedents, it would clearly be excessive to allow compensatory damages to be based upon the highest price reached during the remaining life of the March 1984 S & P's that were liquidated, unless, of course, the date on which it reached that price was within the time period the jury had first determined to constitute a reasonable time for liquidation.[5] If the case again goes to a jury, it will accordingly be necessary to ensure that any award of compensatory damages is appropriately circumscribed.

## Conclusion

The judgment below is reversed and the case remanded with directions to enter judgment for defendants D.E. Jones Commodities, Inc. and Alpha O. Nickelberry on plaintiff's claim of fraud based upon a misrepresentation as to safety, and to enter judgment for defendant Nickelberry on plaintiff's claim of breach of contract; and for a new trial of the balance of plaintiff's claims. Since no error has been asserted with respect to the dismissal of defendants'

---

**4.** To quote from Jones' main brief on appeal, p. 38 n. 20:

> The highest trading price during the period that the jury considered was 159.75 on February 27, 1984.... Using the same method of calculation [previously] described ..., damages based on that high price would be the product of (i) 159.75 minus 156.40 times (ii) 20 contracts times (iii) $500 ... [plus] ... the product of (i) 159.75 minus 156.45 times (ii) 30 contracts times (iii) $500. The sum of

those two products ($33,000 and $49,500, respectively) is $83,000.

**5.** To avoid any possible misunderstanding, we note that our previous discussion, indicating that $83,000 in compensatory damages would result from such a computation, was intended to demonstrate that the jury verdict of $296,195 was excessive and unresponsive to the court's instructions by any conceivable measure, not that $83,000 is necessarily a correct amount of compensatory damages.

counterclaims and third party claims against plaintiff, that dismissal is affirmed.